| | |
|---|---|
| JANE DOE (C.A.A.) an individual, | |
| *Plaintiff,* | |
| v. | CIVIL ACTION NO. 3:24-cv-012299 |
| HYATT CORPORATION; HYATT FRANCHISING, LLC; FIREWHEEL HOTEL LTD.; INTER-CONTINENTAL HOTELS GROUP, INC.; INTERCONTINENTAL HOTELS GROUP (U.S.A.) FRANCHISING, INC.; HOLIDAY HOSPITALITY FRANCHISING, LLC; BDNKR HOSPITALITY LP; and LOTUSTEL GROUP, LLC, | |
| *Defendants.* | JURY TRIAL DEMANDED |

## **PLAINITFF'S ORIGINAL PETITION**

Jane Doe (C.A.A.), Plaintiff in the above-styled and numbered cause, files this Original Petition against HYATT CORPORATION; HYATT FRANCHISING, LLC; FIREWHEEL HOTEL LTD.; INTER-CONTINENTAL HOTELS GROUP, INC.; INTERCONTINENTAL HOTELS GROUP (U.S.A.) FRANCHISING, INC.; HOLIDAY HOSPITALITY FRANCHISING, LLC; BDNKR HOSPITALITY LP; and LOTUSTEL GROUP, LLC, as Defendants, and would respectfully show the Court and jury as follows:

## **SUMMARY**

1. Jane Doe (C.A.A.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act through force, fraud, or coercion.[1] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel victims to engage in commercial sex acts against their will.

3. Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

4. Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

5. In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

6. Jane Doe (C.A.A.) alleges that Defendants derived financial benefit from facilitating sex trafficking by providing a venue where traffickers could exploit victims, including Jane Doe (C.A.A.), with minimal risk of detection or interruption. Jane Doe (C.A.A.) further alleges that Defendants continued providing support for traffickers, including her own trafficker, despite obvious and apparent signs of sex trafficking in these hotels. Defendants were, therefore,

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

7. Defendants had the knowledge and opportunity to prevent the severe and permanent harm that Jane Doe (C.A.A.) experienced as the result of continuous sexual exploitation. Defendants failed to do so. Instead, Defendants chose to benefit from facilitating sex trafficking. Accordingly, Jane Doe (C.A.A.) files this lawsuit.

**PARTIES**

8. Plaintiff, Jane Doe (C.A.A.) is a resident of California. She may be contacted through her lead counsel, whose information is contained below.

9. Jane Doe (C.A.A.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of being caused, through force fraud or coercion, to commit a commercial sex act.

10. The trafficking of Jane Doe (C.A.A.) occurred in or affected interstate commerce.

11. Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (C.A.A.)

12. Defendant Hyatt Corporation is a for-profit Delaware company with its principal place of business in Chicago, Illinois. It may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

13. Defendant Hyatt Franchising, LLC is a for-profit Delaware company with its principal place of business in Chicago, Illinois. It may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

14. Defendants Hyatt Corporation and Hyatt Franchising, LLC, will collectively be referred to as "Hyatt," "Hyatt Defendants," or "Franchisor Defendants." Upon information and belief, they owned, operated, controlled, and/or managed the following Franchisee location:

   a. FIREWHEEL HOTEL LTD. d/b/a Hyatt Place located at 5101 N. President George Bush Highway, Garland, Texas 75040.

15. Defendant Firewheel Hotel Ltd. d/b/a Hyatt Place located at 5101 N. President George Bush Highway, Garland, Texas 75040 is a for profit limited company with its principal place of business in Texas. It may be served through its registered agent Ted R. Pittman at 2701 E President George Bush Highway, Suite 200, Plano, Texas 75074. Firewheel Hotel Ltd. will be referred to as a "Francisee Defendant."

16. Defendant Inter-Continental Hotels Group, Inc. is a for-profit Delaware company with its principal place of business in Atlanta, Georgia. It may be served through its registered agent: The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

17. Defendant Intercontinental Hotels Group (U.S.A.) Franchising, Inc. is a for-profit Delaware company with its principal place of business in Atlanta, Georgia. It may be served through its registered agent: The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

18. Defendant Holiday Hospitality Franchising, LLC is a for-profit Delaware company with its principal place of business in Atlanta, Georgia. It may be served through its registered agent: United Agent Group Inc., 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803.

19. Defendants Inter-Continental Hotels Group, Inc., Intercontinental Hotels Group (U.S.A.) Franchising, Inc., and Holiday Hospitality Franchising, LLC, will collectively be referred to as "IHG," "IHG Defendants," or "Franchisor Defendants." Upon information and belief, they owned, operated, controlled, and/or managed the following Franchisee locations:

4

a. BDNKR Hospitality LP d/b/a Holiday Inn located at 4960 Arapaho Road, Addison, Texas 75001; and

b. LOTUSTEL GROUP, LLC d/b/a Holiday Inn, located at 5110 N President George Bush Highway, Garland, Texas 75040.

20. Defendant BDNKR Hospitality LP d/b/a Holiday Inn located at 4960 Arapaho Road, Addison, Texas 75001 is a for profit limited partnership with its principal place of business in Texas. It may be served through its registered agent D N Patel at 300 Cedar Elm Court, Irving, Texas 75063. BDNKR Hospitality will be referred to as a "Francisee Defendant."

21. Defendant LOTUSTEL GROUP, LLC d/b/a Holiday Inn, located at 5110 N President George Bush Highway, Garland, Texas 75040 is a for profit limited liability company with its principal place of business in Texas. It may be served through its registered agent Naveen Shah at 2201 N Collins Street, Arlington, Texas 76011. Lotustel Group, LLC will be referred to as a "Franchisee Defendant."

**JURISDICTION AND VENUE**

22. This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

23. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district.

24. Under 28 U.S.C. § 1391(c)(2), Franchisees are residents of Texas for the purpose of § 1391(b)(1) because the Court has personal jurisdiction over each Francisee.

25. Under § 1391(d), Franchisees are residents of Texas for the purpose of § 1391(b)(1) because, if the Northern District of Texas was a separate state, Franchisee's contacts with the district would be sufficient to subject it to personal jurisdiction.

26. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Texas.

27. Plaintiff's claims against Franchisors arise out of Franchisors' contacts with Texas through Franchisors' relationships with the Franchisee Defendants, which operated the subject hotel properties in the Northern District of Texas and have their principal place of business in the Northern District of Texas. Franchisors' participation in a venture with the Franchisee Defendants operating the subject motels occurred, in substantial part, in Texas. The benefit received by the Franchisors originated and was sought for collection in Texas.

### STATEMENT OF FACTS

**I. Jane Doe (C.A.A.) was a Victim of Unlawful Sex Trafficking at Hotels Owned, Operated, Managed and Controlled by Defendants.**

28. Jane Doe (C.A.A.) was trafficked through force and coercion by her trafficker to engage in numerous commercial sex acts. Jane Doe (C.A.A.) was trafficked continuously between May 21, 2014 and May 25, 2014 at the following locations:

   a. FIREWHEEL HOTEL LTD. d/b/a Hyatt Place located at 5101 N President George Bush Highway, Garland, Texas 75040;

   b. BDNKR Hospitality LP d/b/a Holiday Inn located at 4960 Arapaho Road, Addison, Texas 75001; and

   c. LOTUSTEL GROUP, LLC d/b/a Holiday Inn, located at 5110 N President George Bush Highway, Garland, Texas 75040.

29. Jane Doe (C.A.A.)'s trafficking repeatedly occurred in rooms of these Hyatt and Holiday Inn locations and was facilitated by Hyatt, IHG, and Franchisee Defendants.

**II.    The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.**

30.    While the widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Franchisor Defendants and Franchisee Defendants knew or should have known regarding the trafficking at their hotel properties, trafficking activity, including that of Jane Doe (C.A.A.) was pervasive and apparent at the locations at issue.

31.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[2] For years, sex traffickers have "been able to reap enormous profits with little risk when attempting to operate within hotels."[3] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4] Hotels have been found to account for over 90 percent of commercial exploitation of children.[5]

32.    Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[6]

33.    Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and

---

[2] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id*

[3] *See Human Trafficking in the Hotel Industry*, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[4] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[5] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[6] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[7]

34.     Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

b. Individuals show signs of physical abuse, restraint, and/or confinement;

c. Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d. Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e. Individuals lack freedom of movement or are constantly monitored;

f. Individuals avoid eye contact and interaction with others;

g. Individuals have no control over or possession of money or ID;

h. Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

i. Individuals have few or no personal items—such as no luggage or other bags;

j. Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

k. A group of girls appears to be traveling with an older female or male;

---

[7] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023); National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

l. A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m. Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n. Possession of bulk sexual paraphernalia such as condoms or lubricant;

o. Possession or use of multiple cell phones; and

p. Possession or use of large amounts of cash or pre-paid cards.[8]

35. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[9] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

36. The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[10] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

37. The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants

---

[8] *Id.*

[9] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

[10] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[11]

38.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

39.     The most effective weapon against sexual exploitation and human trafficking is education and training.[12]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[13]

40.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[14]  In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

41.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and

---

[11] *Id.*

[12] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[13] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[14] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

42. Each of the Franchisor Defendants and Franchisee Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

43. Unfortunately for Jane Doe (C.A.A.), the promises made by the Franchisor Defendants and Franchisee Defendants have proven empty. Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (C.A.A.).

**III. Sex Trafficking Has Long Been Prevalent at Hyatt and Holiday Inn Branded Properties, and Defendants Have Known About It.**

44. Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (C.A.A.)'s trafficking, that sex trafficking was ongoing and widespread at Hyatt and Holiday Inn branded properties including the subject properties named herein.

**a. Sex Trafficking at Hyatt and Holiday Inn Branded Hotels was well Known by Defendants.**

45. Upon information and belief, each of the Defendants monitored criminal activity occurring at Hyatt and Holiday Inn branded hotels and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the specific hotel properties where Jane Doe (C.A.A.) was trafficked.

46. Scores of news stories from across the US highlight Hyatt and IHG's facilitation of sex trafficking and certainly establish that Defendants knew, or should have known, of the use of Hyatt and Holiday Inn hotels for sex trafficking.

47. Information that has become public through news stories establishes the entrenched and pervasive nature of Hyatt and IHG's role in providing a venue where sex trafficking has continued unabated for years. Among notable press involving the frequent use of Hyatt and Holiday Inn hotels for illegal activity, the following was noted:

- In June 2018, a woman was criminally charged for the murder and sex trafficking of a 19 year old girl at a Hyatt Place Hotel in Braintree, Massachusetts.[15]

- In April 2017, a 16 year old trafficking victim was rescued by police at a Holiday Inn hotel in Elk Grove, California after her Uber driver noticed signs of trafficking as he dropped her off at the hotel and called the police.[16]

- In September 2018, a may was criminally charged after a three month investigation for sex trafficking and was arrested at a Holiday Inn in Plainview, New York.[17]

- In 2014, police arrested several individuals for running a sex trafficking ring out of a Holiday Inn in Allentown, Pennsylvania.[18]

- A 2017 analysis by the Houston Chronicle showed that IHG branded hotels were one of the most common locations for prostitution and sex trafficking arrests made by the Houston Police Department.[19]

48. Ultimately, several hundred traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of Hyatt and Holiday Inn branded properties.

---

[15] Lynn Woman Accused Of Murder, Human Trafficking Held Without Bail, WBZ News, https://www.cbsnews.com/boston/news/braintree-hotel-murder-reina-rodriguez-juana-rivera-arraignment/.

[16] Uber Driver Saves Girl From Sex Slavery, Daily Beast, https://www.thedailybeast.com/uber-driver-saves-girl-from-sex-slavery.

[17] Police: Gang Member Forced Women Into Prostitution, News12 New York, https://bronx.news12.com/police-gang-member-forced-women-into-prostitution-39006797.

[18] Prostitutes From Maryland Worked Out Of Downtown Allentown Hotel, Police Say, Lehigh Valle Live, https://www.lehighvalleylive.com/allentown/2014/04/trio_ran_prostitution_business.html.

[19] Houston's Most Popular Hotels For Prostitution Busts, Houston Chronicle, https://www.chron.com/news/houston-texas/houston/article/Houston-s-most-popular-hotels-for-prostitution-11744958.php.

49. Based on information and belief, the Hyatt and IHG Defendants and Franchisee Defendants managed and monitored on-line reviews of Hyatt and Holiday Inn hotel locations:

- Regarding a September 2017 stay at a Holiday Inn in Asheville, North Carolina, a customer wrote: "On our fourth day of our anniversary trip an escort or prostitute if you will knocked on my door after midnight asking if we called for services. The hotel claims they do not tolerate this, however the security guard knew immediately who I was referring to as I went to complain…"[20]

- Regarding a July 2012 stay at a Holiday Inn in Las Cruces, New Mexico, a customer wrote: "…before I could get inside the hotel I was asked if I would like to 'party' with some girls. No thanks, but I did call the local police. There are about 5 hotels all nearby & they were making the rounds…"[21]

- Regarding an August 2013 stay at the Holiday Inn in Seattle, Washington, a customer wrote: "…located in the district which seems to specialize in prostitution…"[22]

50. This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (C.A.A.) was trafficked at the subject properties, the Hyatt and IHG Defendants knew or should have known that:

a. There was widespread and ongoing sex trafficking occurring at Hyatt and Holiday Inn branded properties;

b. Sex trafficking was a brand-wide problem for Hyatt and Holiday Inn originating from management level decisions at Hyatt and IHG's corporate offices;

c. Hyatt and Holiday Inn franchisees and hotel staff were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties;

d. Hyatt and Holiday Inn's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

---

[20] Review of Holiday Inn – Asheville, North Carolina (Sep. 28, 2017), available at https://www.tripadvisor.com/ShowUserReviews-g60742-d93926-r528092206-Holiday_Inn_Asheville_Biltmore_West-Asheville_North_Carolina.html.
[21] Review of Holiday Inn Las Cruces, New Mexico (July 15, 2012), *available at* https://www.tripadvisor.com/ShowUserReviews-g47087-d631385-r134485175-Holiday_Inn_Express_Hotel_Suites_Las_Cruces-Las_Cruces_New_Mexico.html.
[22] Review of Holiday Inn Seattle, Washington (September 3, 2013), *available at* https://www.tripadvisor.com/ShowUserReviews-g60878-d223217-r175631783-Holiday_Inn_Express_Hotel_Suites_North_Seattle_Shoreline-Seattle_Washington.html

e. Hyatt and Holiday Inn and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

51. Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, Hyatt and IHG chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

**b. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the subject Hyatt and Holiday Inn locations.**

52. Franchisor and Franchisee Defendants were specifically aware that sex trafficking was widespread and ongoing at the subject Hyatt and Holiday Inn locations.

53. Online reviews of Defendants' hotels, which upon information and belief were monitored by Franchisor and Franchisee Defendants, establish the nature of the role the Hyatt and Holiday Inn serves as a venue for sex trafficking. For example:

a. A 2014 Tripadvisor review for the subject Hyatt states: "Better off going to the Holiday Inn across the street. Cleaning people took the do not disturb sign off of my door and proceeded to enter. The sign went missing so I called the front desk for a replacement. The lady at the front desk said she would replace it in just a minute, six hours later, no sign. When I finally went down myself, I was told they didn't have any signs, so I would have to make one myself and tape it to the door. Cleaning staff frequently holds elevators to go down one flight, when there are stairs that are easily accessible. Tried purchasing food items from the front desk multiple times with way too much hassle. Waited at the front desk with a crowd of over 10 other patrons for more than 15 minutes. While waiting, I thought it may be useful to call the hotel to get somebody to come to the desk. I was sorely wrong. On another occasion I stood waiting while the lady at the desk spent far too long with somebody on the phone, rather than helping the gathering crowd of people in front of her. Another night the two girls at the front desk took their time checking in people so that they could hold a conversation with drunken patrons over what type of person of the opposite sex they are attracted to. I stayed here for more than a week, and found that no one employee was better than the other at upholding the ideals of hospitality. This hotel needs some serious employee training, and I question the competency of management."[23]

_____

[23] https://www.tripadvisor.com/Hotel_Review-g55884-d1218848-Reviews-Hyatt_Place_Dallas_Garland_Richardson-Garland_Texas.html.

b. A 2021 Tripadvisor review for the subject Hyatt states: "This hotel did not approach the standard of any other Hyatt I have ever stayed at. The rooms, lobby, and bar/restaurant area were all dirty. Housekeeping was not provided. The outdoor pool was closed. The room had sex toy lube left by a previous occupant and the sheets were old and worn. Only one bath towel was provided. All of this was blamed on covid by the staff, but other nearby hotels had all facilities in operation and maintained a clean operation. It appears the hotel owner is trying to use covid as an excuse to minimize expenses and is allowing everything to suffer. The location will make me question ever using a Hyatt facility again."[24]

54. Traffickers, including Jane Doe (C.A.A.)'s trafficker, repeatedly chose to use these subject Hyatt and Holiday Inn locations for their sex trafficking activity. As such, Franchisor and Franchisee Defendants also knew or should have known about the pervasive sex trafficking at the Hyatt and Holiday Inn locations based on obvious indicators of this activity.

55. Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the subject Hyatt and Holiday Inn locations named herein prior to Jane Doe (C.A.A.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

---

[24] https://www.tripadvisor.com/Hotel_Review-g55884-d1218848-Reviews-Hyatt_Place_Dallas_Garland_Richardson-Garland_Texas.html.

56. All knowledge from the staff at these subject Hyatt and Holiday Inn locations is imputed to Franchisee Defendants. Franchisee Defendants knew about this widespread and ongoing trafficking at these Hyatt and Holiday Inn locations, including the trafficking of Jane Doe (C.A.A.), through the direct observations of hotel staff, including management-level staff.

57. Upon information and belief, both the Franchisor Defendants and Franchisees knew or should have known about the widespread trafficking at the subject Hyatt and Holiday Inn locations referenced herein, based on:

    a. The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the Franchisor Defendants;

    b. The Defendants' regular monitoring of online reviews;

    c. The Defendants' collection and monitoring of customer surveys and complaints;

    d. The Defendants' regular inspections of the hotel property;

    e. Information provided to Defendants by law enforcement; and

    f. Other sources of information available to Defendants.

58. Upon information and belief, under the Franchisor Defendants' protocols, which on their face required hotel staff and management to report suspected criminal activity to the Franchisor Defendants, hotel staff and management were required to report numerous instances of suspected sex trafficking to the Franchisor Defendants prior to Jane Doe (C.A.A.)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the subject Hyatt and Holiday Inn locations.

**d. Defendants knew Jane Doe (C.A.A.) was being trafficked at these subject Hyatt and Holiday Inn locations because of the apparent and obvious "red flags" of sex trafficking.**

59. During the period that Jane Doe (C.A.A.) was trafficked at the subject Hyatt and Holiday Inn locations named herein, there were obvious signs that her traffickers were engaged in sex trafficking:

a. The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards;

b. Other girls were trafficked at the same hotel at the same time as Jane Doe (C.A.A.);

c. Even though Jane Doe (C.A.A.) and her traffickers would stay for multiple days at a time, housekeeping was kept away by using the "Do Not Disturb" door hanger;

d. Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services;

e. The traffickers were often present with Jane Doe (C.A.A.) at check in and would linger around the hotel or in the parking lot while she was with a john;

f. There was heavy foot traffic in and out of Jane Doe (C.A.A.)'s room involving men who were not hotel guests;

g. Jane Doe (C.A.A.) had multiple johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time; and

h. Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

60. Based upon information and belief, multiple employees at the subject Hyatt and Holiday Inn locations named herein, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

61. As such, Franchisee Defendants knew or was willfully blind to the fact that Jane Doe (C.A.A.) was being trafficked at the subject Hyatt and Holiday Inn properties.

62. Given these obvious signs, Hyatt and IHG knew or should have known about the trafficking of Jane Doe (C.A.A.) based on its policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

**IV. Defendants actively facilitated sex trafficking at these subject Hyatt and Holiday Inn locations, including the trafficking of Jane Doe (C.A.A.).**

63. Franchisor and Franchisee Defendants had both actual and constructive knowledge of the trafficking of Jane Doe (C.A.A.) at these Hyatt and Holiday Inn locations because the trafficking was the direct result of Franchisor and Franchisee Defendants facilitating her trafficking at the Hyatt and Holiday Inn locations.

**a. Franchisee Defendants facilitated the trafficking of Jane Doe (C.A.A.).**

64. Franchisee Defendants are responsible for the acts, omissions, and knowledge of all employees of these Hyatt and Holiday Inn locations when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Franchisee Defendants ratified these acts and omissions, and because Franchisee Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee Defendants, of sex trafficking occurring at these Hyatt and Holiday Inn branded locations including the subject locations.

65. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Hyatt and Holiday Inn locations, Franchisee Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

66. Franchisee Defendants knew or was willfully blind to the fact that Jane Doe (C.A.A.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (C.A.A.)'s sexual exploitation.

67. Franchisee Defendants also facilitated widespread trafficking at their subject Hyatt and Holiday Inn locations, including the trafficking of Jane Doe (C.A.A.), in ways including:

a. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

b. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c. choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures; and

d. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**b. The Franchisor Defendants facilitated the trafficking of Jane Doe (C.A.A.).**

68. Upon information and belief, the Franchisor Defendants participated directly in aspects of the operation of the subject Hyatt and Holiday Inn properties that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Jane Doe (C.A.A.), as follows:

a. The Franchisor Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

b. The Franchisor Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

c. The Franchisor Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The Franchisor Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

d. Although they delayed making any reasonable effort to do so, the Franchisor Defendants acknowledge that they retain control to adopt requirements for

franchised hotels specifically designed to prevent human trafficking and other criminal activity;

e. The Franchisor Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the subject Hyatt and Holiday Inn locations;

f. The Franchisor Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the subject Motel 6 locations, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

g. The Franchisor Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the subject Hyatt and Holiday Inn locations, including trends that would reveal patterns consistent with human trafficking.

69.    Hyatt and IHG directly participated in and retained day-to-day control over renting rooms at the subject Hyatt and Holiday Inn locations by, among other things:

a. The Franchisor Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b. The Franchisor Defendants directly made reservations for rooms at the subject Hyatt and Holiday Inn locations and accepted payment for those rooms through a central reservation system that they controlled and operated. The Franchisor Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement;

c. The Franchisor Defendants established and maintained control over a brand-wide "do not rent" system. The Franchisor Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the subject Hyatt and Holiday Inn locations through detailed policies that it established regarding use of this "do not rent" system;

d. The Franchisor Defendants controlled room rates, required discounts, mandatory fees, and rewards program;

e. The Franchisor Defendants controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation;

f. The Franchisor Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

g. The Franchisor Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the subject Hyatt and Holiday Inn locations;

h. The Franchisor Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the subject Hyatt and Holiday Inn locations until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

i. The Franchisor Defendants required franchisees to use Hyatt and IHG's property management system, which was owned, maintained, controlled, and operated by the Franchisor Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

70. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Hyatt and Holiday Inn locations named herein, Franchisor Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (C.A.A.).

71. Franchisor Defendants knew or should have known that Jane Doe (C.A.A.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (C.A.A.)'s sexual exploitation.

72. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the subject Hyatt and Holiday Inn locations, the Franchisor Defendants continued participating in a venture at these hotels, with its franchisees and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

a. The Franchisor Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

b. The Franchisor Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

c. The Franchisor Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Hyatt and Holiday Inn properties;

d. The Franchisor Defendants implicitly approved decisions by franchisees and hotel staff not to report or respond to criminal activity including sex trafficking appropriately;

e. The Franchisor Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the subject Hyatt and Holiday Inn locations;

f. The Franchisor Defendants attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal;

g. Despite having specific knowledge of policies that would significantly reduce sex trafficking at its branded locations including the subject Hyatt and Holiday Inn locations, the Franchisor Defendants declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties;

h. The Franchisor Defendants willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner;

i. The Franchisor Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability; and

j. The Franchisor Defendants provided traffickers with access to internet services in a manner that the Franchisor Defendants knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

73. If Franchisor Defendants had exercised reasonable diligence when operating their Hyatt and Holiday Inn properties and in the areas where it retained control, Franchisor Defendants would have prevented the subject Hyatt and Holiday Inn locations from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (C.A.A.). Instead, Franchisor Defendants engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (C.A.A.).

## V. Defendants' ventures at the Hyatt and Holiday Inn properties.

74. Through the conduct described above, Franchisor and Franchisee Defendants knowingly benefited from engaging in a venture with sex traffickers at the subject Hyatt and Holiday Inn locations named herein, including Jane Doe (C.A.A.)'s traffickers, as follows:

a. Franchisor and Franchisee Defendants both received benefits, including increased revenue, every time a room was rented at any Motel 6 location;

b. This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the Hyatt and Holiday Inn locations, which Franchisor and Franchisee Defendants knew or should have known about;

c. Franchisor and Franchisee Defendants associated with traffickers, including Jane Doe (C.A.A.)'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity;

d. Franchisor and Franchisee Defendants had a mutually beneficial relationship with the traffickers at the Hyatt and Holiday Inn locations, fueled by sexual exploitation of victims, including Jane Doe (C.A.A.);

e. Sex traffickers, including Jane Doe (C.A.A.)'s traffickers, frequently used the Motel 6 locations for their trafficking because of an implicit understanding that the Motel 6 locations were an avenue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Franchisor and Franchisee Defendants facilitating that trafficking as described throughout this petition. This resulted in benefits, including increased revenue, for Franchisor and Franchisee Defendants;

f. Both Franchisor and Franchisee Defendants participated in this venture through the conduct described throughout Plaintiff's Original Petition, as they were jointly responsible for relevant aspects of hotel operations; and

g. Jane Doe (C.A.A.)'s trafficking at the subject Hyatt and Holiday Inn locations was a result of Franchisor and Franchisee Defendants' participation in a venture with criminal traffickers. If Franchisor and Franchisee Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (C.A.A.)'s trafficking at the subject Hyatt and Holiday Inn locations.

75. Through the conduct described above, Franchisor Defendants also knowingly benefited from engaging in a commercial venture with Franchisee Defendants operating the Hyatt and Holiday Inn locations as follows:

a. Franchisor Defendants associated with Franchisee Defendants to operate the Hyatt and Holiday Inn locations;

b. Pursuant to the terms of the franchising agreement, both Franchisor and Franchisee Defendants received financial benefits from operating the Hyatt and Holiday Inn properties, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue;

c. By participating in a venture that facilitated sex trafficking, each Franchisor and Franchisee also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the subject Motel 6 locations specifically;

d. This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of Franchisee Defendants and the widespread sex trafficking at the subject Hyatt and Holiday Inn locations named herein;

e. Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), Hyatt and IHG participated in the venture by continuing to associate with Franchisee Defendants to operate the Hyatt and Holiday Inn locations named herein in a way that it knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe (C.A.A.); and

f. Jane Doe (C.A.A.)'s trafficking at the Hyatt and Holiday Inn locations named herein was a result of Franchisor and Franchisee Defendants' facilitation of the widespread and ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the Hyatt and Holiday Inn locations. Had Hyatt and IHG not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), it would not have received a benefit from Jane Doe (C.A.A.)'s trafficking at the subject Hyatt and Holiday Inn location named herein.

**VI.    Franchisee Defendants and the Staff at the Hyatt and Holiday Inn Locations Named Herein Acted as Actual Agents of Hyatt and IHG.**

76.     Hyatt and IHG are vicariously liable for the acts, omissions, and knowledge of Franchisee Defendants and staff at the subject Hyatt and Holiday Inn locations named herein, which are Hyatt and IHG's actual agents or subagents.

77.     The Franchisor Defendants subjected Franchisee Defendants to detailed standards and requirements regarding the operation of the subject Hyatt and Holiday Inn locations named herein through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Franchisor Defendants.

78.     The Franchisor Defendants obscure the full extent of control they exercise over the Franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Franchisee Defendants imposed on the franchisees:

   a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendants used at the subject Hyatt and Holiday Inn locations;

   b. covered virtually all aspects of hotel operations, including internal operating functions;

   c. dictated the specific manner in which Franchisee Defendants and hotel staff must carry out most day-to-day functions at the subject Hyatt and Holiday Inn locations; and

   d. significantly exceeded what was necessary for Hyatt and IHG to protect its registered trademarks.

79.     In addition to the ways described above, upon information and belief, Hyatt and IHG exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendants' day-to-day operation of the subject Hyatt and Holiday Inn locations named herein, including the following ways:

a. The Franchisor Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Franchisor Defendants to protect their registered trademarks;

b. The Franchisor Defendants provided training for hotel management and select hotel staff on-site at the subject Hyatt and Holiday Inn and at locations selected by the Franchisor Defendants;

c. The Franchisor Defendants required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

d. The Franchisor Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. The Franchisor Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that franchisees were required to purchase to operate the subject Hyatt and Holiday Inn locations named herein, the Franchisor Defendants designated approved vendors and prohibited franchisees from purchasing goods and services from anyone other than an approved vendor;

g. The Franchisor Defendants required franchisees to sign a technology agreement governing the terms under which franchisees must procure and use technical services and software while operating the subject Hyatt and Holiday Inn locations named herein. Franchisees were required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

h. The Franchisor Defendants set required staffing levels for the subject Hyatt and Holiday Inn locations named herein;

i. The Franchisor Defendants established detailed job descriptions for all positions in its Hyatt and Holiday Inn properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. The Franchisor Defendants set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions;

k. The Franchisor Defendants provided benefits for employees of franchised hotels;

l. The Franchisor Defendants required Defendant Franchisees to use a customer resource management program maintained and operated by the Franchisor Defendants;

m. The Franchisor Defendants controlled channels for guests to report complaints or provide feedback regarding the subject Hyatt and Holiday Inn locations and directly participated in the response and/or supervised the response to customer complaints or other feedback. The Franchisor Defendants retained the right to provide refunds or other compensation to guests and to require Defendant Franchisees to pay associated costs;

n. The Franchisor Defendants generated reports and analysis of guest complaints and online reviews for the subject Hyatt and Holiday Inn locations;

o. The Franchisor Defendants required Defendant Franchisees to use a Guest Relations Application owned, operated, and maintained by the Franchisor Defendants to manage all guest data and information. The Franchisor Defendants could use the backend of this system to analyze data and generate reports;

p. The Franchisor Defendants set detailed requirements for insurance that franchisees must purchase and retain the right to purchase insurance for franchisees and to bill franchisees directly for that insurance if the Franchisor Defendants determined that the franchisees have not purchased adequate insurance;

q. The Franchisor Defendants regularly audited the books and records of Defendant Franchisees;

r. The Franchisor Defendants conducted frequent and unscheduled inspections of Hyatt and Holiday Inn properties, including the subject Hyatt and Holiday Inn locations named herein;

s. The Franchisor Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreements if franchisees violated any of the Franchisor Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the subject Hyatt and Holiday Inn location named herein;

t. The Franchisor Defendants controlled all marketing for the subject Hyatt and Holiday Inn locations and prohibited franchisees from maintaining any online presence unless specifically reviewed and approved by the Franchisor Defendants;

u. The Franchisor Defendants imposed detailed recordkeeping and reporting requirements on Defendant Franchisees regarding virtually all aspects of hotel operations;

v. The Franchisor Defendants supervised and controlled day-to-day operations of the subject Hyatt and Holiday Inn locations named herein through detailed information and extensive reports that it obtained through the property management system and other software systems it required Defendant Franchisees to use; and

w. The Franchisor Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

**VII. Defendants are Jointly and Severally Liable for Jane Doe (C.A.A.)'s Damages.**

80. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (C.A.A.).

81. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (C.A.A.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

82. Jane Doe (C.A.A.) incorporates all previous allegations.

**I. Count 1: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee Defendants)**

83. Jane Doe (C.A.A.) is a victim of sex trafficking within the meaning of §1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

84. Franchisee Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because Franchisee Defendants:

a. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including Jane Doe (C.A.A.) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

b. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel properties.

85. Violations of 18 U.S.C §1595(a) by each of the Defendants as "perpetrators" operated, jointly, with other unlawful acts and omissions alleged in this Amended Petition, to cause

Jane Doe (C.A.A.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

**II.      Count 2: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).**

86.      Jane Doe (C.A.A.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

87.      Through acts and omissions described throughout this Petition, Franchisor Defendants and Franchisee Defendants received a financial benefit from participating in a venture with traffickers, including Jane Doe (C.A.A.)'s traffickers, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe (C.A.A.)'s traffickers, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, Franchisor Defendants and Franchisee Defendants are liable as a beneficiary under 18 U.S.C §1595(a).

88.      Through the acts and omissions described throughout this Complaint, Franchisor Defendants received a financial benefit from participating in a venture with its respective franchisees regarding the operations of its respective hotel properties even though Franchisor Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

89.      Violations of 18 U.S.C §1595(a) by Franchisor Defendants and Franchisee Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (C.A.A.) to suffer substantial physical and psychological

injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

**III.     Count 3: Vicarious Liability for TVPRA Violations (Franchisor Defendants).**

90.     Franchisee Defendants acted as the actual agent of its respective Franchisor Defendants when operating its respective hotel property.

91.     Through the acts and omissions described throughout this Amended Petition, Franchisor Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisees to operate its respective hotel property.

92.     Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agents and its subagents.

93.     Franchisor Defendants are vicariously liable for the TVPRA violations of its franchisees and the subagents of that franchisee.

94.     As alleged above, Franchisor Defendants are directly liable to Jane Doe (C.A.A.) for violations of the TVPRA, both as perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). Franchisee Defendants are also directly liable to Jane Doe (C.A.A.) under § 2255. Franchisor Defendants are vicariously liable to Jane Doe (C.A.A.) for those same violations.

**DAMAGES**

95.     Franchisor and Franchisee Defendants' acts and omissions, individually and collectively, caused Jane Doe (C.A.A.) to sustain legal damages.

96.     Franchisor and Franchisee Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (C.A.A.).

97. Jane Doe (C.A.A.) is entitled to be compensated for personal injuries and economic damages, including:

    a. Actual damages (until trial and in the future);

    b. Incidental and consequential damages (until trial and in the future);

    c. Mental anguish and emotional distress damages (until trial and in the future);

    d. Lost earnings and lost earning capacity (until trial and in the future);

    e. Necessary medical expenses (until trial and in the future);

    f. Life care expenses (until trial and in the future);

    g. Physical pain and suffering (until trial and in the future);

    h. Physical impairment (until trial and in the future);

    i. Exemplary/Punitive damages;

    j. Attorneys' fees;

    k. Costs of this action; and

    l. Pre-judgment and all other interest recoverable.

## JURY TRIAL

98. Jane Doe (C.A.A.) demands a jury trial on all issues.

## RELIEF SOUGHT

99. WHEREFORE, Jane Doe (C.A.A.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (C.A.A.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (C.A.A.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

/s/ Annie McAdams

**ANNIE MCADAMS PC**
Annie McAdams | SBN 24051014
2900 North Loop West
Suite 1130
Houston Texas 77092
(713) 785-6262
(866) 713-6141 Facsimile
*annie@mcadamspc.com*

and

*/s/ David Harris*

**SICO HOELSCHER HARRIS, LLP**
David E. Harris | SBN 24049273
819 N. Upper Broadway
Corpus Christi, Texas 78401
(361) 653-3300
(361) 653-3333 Facsimile
*dharris@shhlaw.com*

**ATTORNEYS FOR PLAINTIFF**