UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| JANE DOE (C.A.A.) an individual, | |
| *Plaintiff,* | |
| v. | CIVIL ACTION NO. 3:24-cv-01229 |
| HYATT PLACE FRANCHISING, L.L.C.; FIREWHEEL HOTEL LTD.; SIX CONTINENTS HOTELS, INC.;HOLIDAY HOSPITALITY FRANCHISING, LLC; BDNKR HOSPITALITY LP; and LOTUSTEL GROUP, LLC, | |
| *Defendants*. | JURY TRIAL DEMANDED |

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

Jane Doe (C.A.A.), Plaintiff in the above-styled and numbered cause, files this Third Amended Complaint against HYATT PLACE FRANCHISING, L.L.C.; FIREWHEEL HOTEL LTD.; SIX CONTINENTS HOTELS, INC.; HOLIDAY HOSPITALITY FRANCHISING, LLC; BDNKR HOSPITALITY LP; and LOTUSTEL GROUP, LLC, as Defendants, and would respectfully show the Court and jury as follows:

**SUMMARY**

1.      Jane Doe (C.A.A.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to engage in a

1

commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1]

3.      Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[2] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt, bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

4.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

5.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7.      As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing a venue where traffickers could exploit victims, including Jane Doe (C.A.A.).

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[2] 18 U.S.C. §1591(e)(3).

2

8. Defendants continued supporting traffickers, including Jane Doe (C.A.A.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking at its hotel and of Jane Doe (C.A.A.).

## **PARTIES**

9. Plaintiff, Jane Doe (C.A.A.) is a resident of California. She may be contacted through her lead counsel, whose information is contained below.

10. Jane Doe (C.A.A.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of being caused, through force fraud or coercion, to commit a commercial sex act.

11. Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (C.A.A.)

12. Defendant Hyatt Place Franchising, L.L.C. is a for-profit Delaware company with its principal place of business in Chicago, Illinois. It has been served and made an appearance in this case.

13. Defendant Hyatt Place Franchising, L.L.C., will be referred to as "Hyatt," "Hyatt Defendant," or "Hyatt Franchisor Defendants" Upon information and belief, it owned, operated, controlled, and/or managed the following Franchisee location:

    a. FIREWHEEL HOTEL LTD. d/b/a Hyatt Place located at 5101 N. President George Bush Highway, Garland, Texas 75040.

14. Defendant Firewheel Hotel Ltd. d/b/a Hyatt Place located at 5101 N. President George Bush Highway, Garland, Texas 75040 is a for profit limited company with its principal place of business in Texas. It has been served and made an appearance in this case. Firewheel Hotel Ltd. will be referred to as a "Franchisee Defendant" or "Hyatt Franchisee Defendant".

3

15.     Defendant Six Continents Hotels, Inc., is a for-profit Delaware company with its principal place of business in Atlanta, Georgia. It has been served and made an appearance in this case.

16.     Defendant Holiday Hospitality Franchising, LLC is a for-profit Delaware company with its principal place of business in Atlanta, Georgia. It has been served and made an appearance in this case.

17.     Defendants Six Continents Hotels, Inc., and Holiday Hospitality Franchising, LLC, will collectively be referred to as "IHG," "IHG Defendants," "IHG Brand Defendants" or "IHG Franchisor Defendants." "The IHG Defendants were at all relevant times corporate affiliates under the IHG umbrella who were subject to common ownership, had highly integrated operations, shared employees, used common tools and resources, and shared information. All of the IHG Defendants participated in and benefited from the operation of IHG branded hotels, including the Subject Holiday Inn locations below. Upon information and belief, IHG owned, operated, controlled, and/or managed the following Franchisee locations:

   a.  BDNKR Hospitality LP d/b/a Holiday Inn located at 4960 Arapaho Road, Addison, Texas 75001; and

   b.  LOTUSTEL GROUP, LLC d/b/a Holiday Inn, located at 5110 N President George Bush Highway, Garland, Texas 75040.

18.     Defendant BDNKR Hospitality LP d/b/a Holiday Inn located at 4960 Arapaho Road, Addison, Texas 75001 is a for profit limited partnership with its principal place of business in Texas. It has been served and made an appearance in this case. BDNKR Hospitality will be referred to as a "Franchisee Defendant", "Holiday Inn Franchisee Defendant(s)" or "Addison Holiday Inn".

19.     Defendant LOTUSTEL GROUP, LLC d/b/a Holiday Inn, located at 5110 N President George Bush Highway, Garland, Texas 75040 is a for profit limited liability company

4

with its principal place of business in Texas. It has been served and made an appearance in this case. Lotustel Group, LLC will be referred to as a "Franchisee Defendant", "Holiday Inn Franchisee Defendant(s)", or "Garland Holiday Inn".

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district.

22.    Under 28 U.S.C. § 1391(c)(2), Franchisees are residents of Texas for the purpose of § 1391(b)(1) because the Court has personal jurisdiction over each Franchisee.

23.    Under § 1391(d), Franchisees are residents of Texas for the purpose of § 1391(b)(1) because, if the Northern District of Texas was a separate state, Franchisee's contacts with the district would be sufficient to subject it to personal jurisdiction.

24.    Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Texas.

25.    Plaintiff's claims against Franchisors arise out of Franchisors' contacts with Texas through Franchisors' relationships with the Franchisee Defendants, which operated the subject hotel properties in the Northern District of Texas and have their principal place of business in the Northern District of Texas. Franchisors' participation in a venture with the Franchisee Defendants operating the subject motels occurred, in substantial part, in Texas. The benefit received by the Franchisors originated and was sought for collection in Texas.

## STATEMENT OF FACTS

**I.    Jane Doe (C.A.A.) is a Survivor of Trafficking at Hotels Owned, Operated, Managed and Controlled by Defendants.**

26.    Jane Doe (C.A.A.) is a survivor of sex trafficking. Jane Doe (C.A.A.) was trafficked through force and coercion by her trafficker to engage in numerous commercial sex acts.  Jane Doe (C.A.A.) was trafficked continuously from 2012 through October of 2014. Specifically, Jane Doe (C.A.A.) was harbored, maintained, provided, solicited, and forced to engage in commercial sex at the following locations:

   a.   FIREWHEEL HOTEL LTD. d/b/a Hyatt Place located at 5101 N President George Bush Highway, Garland, Texas 75040, specifically during, but not limited to, May 19, 2014 and May 21, 2014;

   b.   BDNKR Hospitality LP d/b/a Holiday Inn located at 4960 Arapaho Road, Addison, Texas 75001, specifically during, but not limited to, May 21, 2014 and May 22, 2014; and

   c.   LOTUSTEL GROUP, LLC d/b/a Holiday Inn, located at 5110 N President George Bush Highway, Garland, Texas 75040, specifically during, but not limited to, May 22, 2014 and May 25, 2014.

27.    Jane Doe (C.A.A.)'s trafficking has profound and apparent effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the subject hotels including effects on Jane Doe (C.A.A.)'s appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others. Observing these effects provided Defendants with notice that Jane Doe (C.A.A.) was being continually subjected to coercion, control, and exploitation.

28.    Jane Doe (C.A.A.) remained under the continuous control of her traffickers through at least October of 2014.

**II.     The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.**

29.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Defendants knew or should have known regarding the trafficking at their hotel properties, the subject locations and the trafficking of Jane Doe (C.A.A.).

30.     Sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[3] For years, sex traffickers have "been able to reap enormous profits with little risk when attempting to operate within hotels."[4] In 2014, 92 percent of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[5] Hotels have been found to account for over 90 percent of commercial exploitation of children.[6]

31.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[7]

32.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and

---

[3] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id*

[4] *See Human Trafficking in the Hotel Industry*, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[5] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[6] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[7] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[8]

33.    Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware of should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[9]

a.   Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

b.   Individuals show signs of physical abuse, restraint, and/or confinement;

c.   Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d.   Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e.   Individuals lack freedom of movement or are constantly monitored;

f.   Individuals avoid eye contact and interaction with others;

g.   Individuals have no control over or possession of money or ID;

h.   Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

i.   Individuals have few or no personal items—such as no luggage or other bags;

j.   Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

---

[8] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).
[9] *See Id.*

k.  A group of girls appears to be traveling with an older female or male;

l.  A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m.  Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n.  Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.  Possession or use of multiple cell phones; and

p.  Possession or use of large amounts of cash or pre-paid cards.[10]

34.  The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[11] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

35.  The relationship between a pimp and a prostitute is inherently coercive, and The United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[12] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

36.  The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants may attempt to draw a distinction

---

[10] *Id.*

[11] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

[12] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

between commercial sex or prostitution and sex trafficking, but they have long understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[13]

37.     All Defendants were aware or should have been aware of these signs of sex trafficking, including those of Jane Doe (C.A.A.), when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

38.     All Defendants were specifically aware that commercial sex in a hotel environment, involving a "pimp," implicitly involves to sex trafficking. Defendants received training and guidance on this. Defendants knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that reasonable diligence required treating signs of commercial sex activity, particularly with apparent and obvious involvement of a "pimp," as evidence of sex trafficking.

39.     Reasonable diligence required Defendants to avoid benefiting from the rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims.

40.     The most effective weapon against sexual exploitation and human trafficking is education and training.[14]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number

---

[13] *Id.*
[14] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

of indicators victims and exploiters exhibit during the time they are on a hotel property.[15]

41.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[16]  In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

42.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

43.     There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged,

---

[15] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[16] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

11

including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.

44.     Defendants' public statements regarding trafficking confirm they are aware of the problem in the hospitality industry. Recognizing the unique vantage point that hotel owners and staff often have to identify potential human trafficking ventures and victims on their properties, several major hotel chains, including franchisors, franchisees, and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking.

45.     Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

46.     Unfortunately for Jane Doe (C.A.A.), Defendants' promises have proved empty time and again. While Defendants' statements reflect actual knowledge of the problem of sex trafficking at their branded hotels, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking and receiving benefits from that trafficking.

47.     Defendants have made the choice, at all levels, to respond inadequately to their knowledge regarding sex trafficking in their hotels. Instead, Defendants have actively chosen to continue to benefit from sex trafficking of victims like Jane Doe (C.A.A.).

### III.   Sex Trafficking Has Long Been Prevalent at Hyatt and IHG Properties, and Defendants Have Known About It.

48.     Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (C.A.A.)'s trafficking, that sex trafficking was ongoing and widespread at Hyatt and IHG branded properties including the subject properties named herein.

12

### a. Sex Trafficking at Hyatt and IHG Hotels was well Known by Defendants.

49.     Use of Hyatt and IHG branded properties, including the Hyatt and Holiday Inn locations, for sex trafficking is well known to Hyatt and IHG.

50.     Upon information and belief, each of the Defendants monitored criminal activity occurring at Hyatt and IHG branded hotels and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the specific hotel properties where Jane Doe (C.A.A.) was trafficked.

51.     Upon information and belief, **Hyatt and IHG** monitored both news stories and online reviews which provided it with notice of widespread criminal activity, including sex trafficking, at its properties, including the specific hotel properties where Jane Doe (C.A.A.) was trafficked.

52.     Upon information and belief, both Hyatt and IHG require reporting of criminal activity and incidents from the franchisee locations, including the specific hotel properties where Jane Doe (C.A.A.) was trafficked.

53.     Scores of news stories from across the US highlight Hyatt and IHG's facilitation of sex trafficking and certainly establish that Defendants knew, or should have known, of the use of Hyatt and IHG hotels for sex trafficking.

54.     Information that has become public through news stories establishes the entrenched and pervasive nature of Hyatt and IHG's role in providing a venue where sex trafficking has continued unabated for years.

- In June 2018, a woman was criminally charged for the murder and sex trafficking of a 19 year old girl at a Hyatt Place Hotel in Braintree, Massachusetts.[17]

---

[17] Lynn Woman Accused Of Murder, Human Trafficking Held Without Bail, WBZ News, https://www.cbsnews.com/boston/news/braintree-hotel-murder-reina-rodriguez-juana-rivera-arraignment/.

13

- In April 2017, a 16 year old trafficking victim was rescued by police at a Holiday Inn hotel in Elk Grove, California after her Uber driver noticed signs of trafficking as he dropped her off at the hotel and called the police.[18]

- In September 2018, a may was criminally charged after a three month investigation for sex trafficking and was arrested at a Holiday Inn in Plainview, New York.[19]

- In 2014, police arrested several individuals for running a sex trafficking ring out of a Holiday Inn in Allentown, Pennsylvania.[20]

- A 2017 analysis by the Houston Chronicle showed that IHG branded hotels were one of the most common locations for prostitution and sex trafficking arrests made by the Houston Police Department.[21]

55.     Based on information and belief, the Hyatt Defendants managed and monitored on-line reviews of their Hyatt locations. These reviews reflected obvious signs of pervasive sex trafficking and related criminal activity at Hyatt hotels across the country. For example:

- Regarding a 2009 stay in Hyatt Regency, in Chicago, Illinois, a customer wrote: "…As I sit typing this at 4AM listing to the people talking (in conversational tones) in the next room. I have been awake for the past two hours, ever since the occupant came back with a prostitute (honest to God!) I laid awake listening to every detail, from payment to completion in gory detail…"[22]

- Regarding a 2016 stay at a Hyatt Regency in Buffalo, New York, a customer wrote: "…There were a lot of prostitutes, people who looked like meth addicts, and guys on loud motorcycles out on Chippewa St, which is the main drag. Some of the bars had signs warning against gang attire, so that should tell you something…"[23]

---

[18] Uber Driver Saves Girl From Sex Slavery, Daily Beast, https://www.thedailybeast.com/uber-driver-saves-girl-from-sex-slavery.

[19] Police: Gang Member Forced Women Into Prostitution, News12 New York, https://bronx.news12.com/police-gang-member-forced-women-into-prostitution-39006797.

[20] Prostitutes From Maryland Worked Out Of Downtown Allentown Hotel, Police Say, Lehigh Valle Live, https://www.lehighvalleylive.com/allentown/2014/04/trio_ran_prostitution_business.html.

[21] Houston's Most Popular Hotels For Prostitution Busts, Houston Chronicle, https://www.chron.com/news/houston-texas/houston/article/Houston-s-most-popular-hotels-for-prostitution-11744958.php.

[22] https://www.tripadvisor.com/Hotel_Review-g35805-d87617-Reviews-Hyatt_Regency_Chicago-Chicago_Illinois.html

[23] https://www.tripadvisor.com/Hotel_Review-g60974-d93122-Reviews-or1920-Hyatt_Regency_Buffalo_Hotel_and_Conference_Center-Buffalo_New_York.html

- Regarding a 2018 stay at a Hyatt Regency in Minneapolis, Minnesota, a customer wrote: ".... In the evenings, the elevators and lobby was heavily populated with prostitutes."[24]

- Regarding a 2019 stay at a Grand Hyatt in San Francisco, California, a customer wrote: "For most of our stay my only complaint was the black mold in my room. But then I saw all the hookers. Seriously, hookers everywhere. In the halls going to/from rooms. In the pool area. In the lobby. All over the front drive and taxi line. They were actually pretty composed but the men they accompanied were mostly not. Swearing, carrying on loud and lewd conversations about all the women they "f@#cked" and generally disregarding that they're at a 5 star hotel rather than a brothel. Each place has their own legal take on prostitution, but given the high scale brand and international guests I can't believe the Grand Hyatt flaunts what most believe to be a human rights violation so aggressively in their guests faces while they're in what's supposed to be the safe confines of their hotel. Absolutely won't recommend to a friend or family, or ever stay at a Grand Hyatt again. PS - I've seen in other reviews the management say "we do not allow this". Well given I watched 2 men with their escorts book rooms for 1 night while high giving the check-in staff high fives and yelling "we're going to f@#%" that's clearly not true."[25]

56.     This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (C.A.A.) was trafficked at the subject Hyatt property, the Hyatt Defendants knew or should have known that:

    a.  There was widespread and ongoing sex trafficking occurring at the Hyatt branded properties;

    b.  Sex trafficking was a brand-wide problem for Hyatt originating from management level decisions at Hyatt's corporate offices;

    c.  Hyatt franchisee and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties;

    d.  Hyatt's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

    e.  Hyatt and its franchisee were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

---

[24] https://www.tripadvisor.com/Hotel_Review-g43323-d90383-Reviews-Hyatt_Regency_Minneapolis-Minneapolis_Minnesota.html
[25] https://www.tripadvisor.com/ShowUserReviews-g294265-d306175-r712056275-Grand_Hyatt_Singapore-Singapore.html

57.    Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, Hyatt chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

58.    Based on information and belief, the IHG Defendants managed and monitored on-line reviews of their IHG locations. These reviews reflected obvious signs of pervasive sex trafficking and related criminal activity at IHG hotels across the country. For example:

- Regarding a September 2017 stay at a Holiday Inn in Asheville, North Carolina, a customer wrote: "On our fourth day of our anniversary trip an escort or prostitute if you will knocked on my door after midnight asking if we called for services. The hotel claims they do not tolerate this, however the security guard knew immediately who I was referring to as I went to complain…"[26]

- Regarding a July 2012 stay at a Holiday Inn in Las Cruces, New Mexico, a customer wrote: "…before I could get inside the hotel I was asked if I would like to 'party' with some girls. No thanks, but I did call the local police. There are about 5 hotels all nearby & they were making the rounds…"[27]

- Regarding an August 2013 stay at the Holiday Inn in Seattle, Washington, a customer wrote: "…located in the district which seems to specialize in prostitution…"[28]

59.    This sampling of news stories, reviews, and other public information also establishes that, at the time Jane Doe (C.A.A.) was trafficked at the subject Holiday Inn properties, the IHG Defendants knew or should have known that:

a. There was widespread and ongoing sex trafficking occurring at the IHG branded properties;

---

[26]    Review    of    Holiday    Inn    –    Asheville,    North    Carolina    (Sep.    28,    2017),    available    at https://www.tripadvisor.com/ShowUserReviews-g60742-d93926-r528092206-Holiday_Inn_Asheville_Biltmore_West-Asheville_North_Carolina.html.
[27] Review of Holiday Inn Las Cruces, New Mexico (July 15, 2012), *available a*t https://www.tripadvisor.com/ShowUserReviews-g47087-d631385-r134485175-Holiday_Inn_Express_Hotel_Suites_Las_Cruces-Las_Cruces_New_Mexico.html.
[28]Review of Holiday Inn Seattle, Washington (September 3, 2013), *available at* https://www.tripadvisor.com/ShowUserReviews-g60878-d223217-r175631783-Holiday_Inn_Express_Hotel_Suites_North_Seattle_Shoreline-Seattle_Washington.html

b.  Sex trafficking was a brand-wide problem for IHG originating from management level decisions at IHG's corporate offices;

c.  IHG's franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties;

d.  IHG's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

e.  IHG and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

60.  Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, IHG chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

**b.  Hyatt Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the specific subject Hyatt locations where Jane Doe (C.A.A.) was trafficked.**

61.  Hyatt Franchisor Defendant was specifically aware that sex trafficking was widespread and ongoing at the subject Hyatt location.

62.  Internet reviews for the subject hotel, which upon information and belief Franchisor and Franchisee Defendants managed and monitored, show the pervasiveness of sex trafficking before and well after Jane Doe (C.A.A.) was trafficked. For example:

a.  A 2014 Tripadvisor review for the subject Hyatt states: "Better off going to the Holiday Inn across the street. Cleaning people took the do not disturb sign off of my door and proceeded to enter. The sign went missing so I called the front desk for a replacement. The lady at the front desk said she would replace it in just a minute, six hours later, no sign. When I finally went down myself, I was told they didn't have any signs, so I would have to make one myself and tape it to the door. Cleaning staff frequently holds elevators to go down one flight, when there are stairs that are easily accessible. Tried purchasing food items from the front desk multiple times with way too much hassle. Waited at the front desk with a crowd of over 10 other patrons for more than 15 minutes. While waiting, I thought it may be useful to call the hotel to get somebody to come to the desk. I was sorely wrong. On another occasion I stood waiting while the lady at the desk spent far too long with somebody on the phone, rather than helping the gathering crowd of people in front of her. Another night the two girls at the front desk took their time checking in people so that they could hold

17

a conversation with drunken patrons over what type of person of the opposite sex they are attracted to. I stayed here for more than a week, and found that no one employee was better than the other at upholding the ideals of hospitality. This hotel needs some serious employee training, and I question the competency of management."[29]

b. A 2021 Tripadvisor review for the subject Hyatt states: "This hotel did not approach the standard of any other Hyatt I have ever stayed at. The rooms, lobby, and bar/restaurant area were all dirty. Housekeeping was not provided. The outdoor pool was closed. The room had sex toy lube left by a previous occupant and the sheets were old and worn. Only one bath towel was provided. All of this was blamed on covid by the staff, but other nearby hotels had all facilities in operation and maintained a clean operation. It appears the hotel owner is trying to use covid as an excuse to minimize expenses and is allowing everything to suffer. The location will make me question ever using a Hyatt facility again."[30]

63.    Traffickers, including Jane Doe (C.A.A.)'s trafficker, repeatedly chose to use the subject Hyatt location for their sex trafficking activity because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking.

64.    The traffickers chose the specific Hyatt, in order to operate with minimal expenditure of time and resources on concealment due to an implicit understanding with the subject hotels that they could operate without risk of disruption.

65.    Jane Doe (C.A.A.)'s traffickers followed routine practices and procedures that resulted in obvious signs matching "red flags" that the Defendants knew and acknowledged to be indicators of sex trafficking..

66.    Upon information and belief and based on hotel reviews, customer complaints and records of law enforcement calls directed to the franchisor Defendant, there were multiple

---

[29] https://www.tripadvisor.com/Hotel_Review-g55884-d1218848-Reviews-Hyatt_Place_Dallas_Garland_Richardson-Garland_Texas.html.
[30] https://www.tripadvisor.com/Hotel_Review-g55884-d1218848-Reviews-Hyatt_Place_Dallas_Garland_Richardson-Garland_Texas.html.

trafficking victims exploited at the subject IHG and Hyatt location(s) named herein prior to Jane Doe (C.A.A.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above.

67.    Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

68.    Most notably, traffickers would employ babysitters or monitors that would remain the hallway or parking lot at the subject locations.  This is a distinct red flag from commercial sex.

69.    All knowledge from the staff at the subject Hyatt location is imputed to Hyatt Franchisee Defendant. Hyatt Franchisee Defendant knew about this widespread and ongoing trafficking at the Hyatt location, including the trafficking of Jane Doe (C.A.A.), through the direct observations of hotel staff, including management-level staff. This knowledge is further imputed to Hyatt Franchisor Defendant based on the existence of an agency relationship as described below.

70.    Upon information and belief, in addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, the Hyatt Franchisor Defendant and Franchisee learned or should have learned about the obvious signs of widespread trafficking at their subject Hyatt location, based on non-public sources of information including but not limited to:

    a.    Surveillance of the property;

b.  Internal investigations;

c.  Customer complaints;

d.  Monitoring of customer feedback;

e.  Information received from law enforcement; and,

f.  other sources of non-public information available to Franchisees.

71.  Upon information and belief, Hyatt Franchisor Defendant knew or should have known about the widespread trafficking at the subject Hyatt location referenced herein, based on:

a.  The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the Franchisor Defendant;

b.  The Hyatt Franchisor Defendant's regular monitoring of online reviews;

c.  The Hyatt Franchisor Defendant's collection and monitoring of customer surveys and complaints;

d.  The Hyatt Franchisor Defendant's requirement that franchisees submit regular and detailed reports to their Hyatt Franchisor Defendants about day-to-day hotel operations;

e.  The Hyatt Franchisor Defendant's regular inspections of the hotel property;

f.  Hyatt Franchisor Defendant's use of field agents who worked directly with the subject location, including through on-site work on security issues;

g.  Hyatt Franchisor Defendant's collection and monitoring of data about guests at the subject locations, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

h.  Hyatt Franchisor Defendant's supervision and control over day-to-day operations of the subject location through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisees to use and through which franchisees were obligated to allow Franchisor Defendants to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

i.  The Hyatt Franchisor Defendant's access to surveillance and security systems;

j.  Information provided to Hyatt Franchisor Defendant by law enforcement; and

k.  Other sources of information available to the Hyatt Franchisor and Franchisee Defendants.

20

72.     Upon information and belief, under the Franchisor Defendant's protocols, which on their face required hotel staff and management and Franchisee Defendant to report suspected criminal activity to their Franchisor Defendant, hotel staff and management and Franchisee Defendant were required to report and did report numerous instances of suspected sex trafficking to their Franchisor Defendant prior to Jane Doe (C.A.A.)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the subject Hyatt locations.

73.     Upon Information and belief, the Hyatt Franchisor Defendants observed obvious "red flags" of numerous instances of sex trafficking occurring at the subject Hyatt locations based on their supervision and monitoring of the property.

c.  **IHG Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the subject Holiday Inn locations**

74.     IHG Franchisor Defendants were also specifically aware that sex trafficking was widespread and ongoing at the subject Holiday Inn locations.

75.     Internet reviews for the subject hotels, which upon information and belief Franchisor and Franchisee Defendants managed and monitor, show the pervasiveness of sex trafficking before and well after Jane Doe (C.A.A.) was trafficked. For example:

   a. A 2018 Yelp review at the subject Holiday Inn states: "…Went down to my car and there were clearly 2 women and their pimp in the parking lot black male 1 white woman with her whole ass showing from her mini mini skirt another white woman that was dressed almost as inappropriately…"[31]

   b. A 2021 Expedia review of the subject Holiday Inn states: "…our neighbors decided to have a sex party and weâ€™re up till 4am."[32]

76.     Traffickers, including Jane Doe (C.A.A.)'s trafficker, repeatedly chose to use the subject Holiday Inn locations for their sex trafficking activity because of policies and practices

---

[31] https://www.yelp.com/biz/holiday-inn-dallas-garland-garland-2
[32] https://www.expedia.co.in/Dallas-Hotels-Holiday-Inn-Garland.h3242873.Hotel-Reviews

21

that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. The traffickers operated with minimal expenditure of time and resources on concealment due to an implicit understanding with the subject hotels that they could operate without risk of disruption. These traffickers followed routine practices and procedures that resulted in obvious signs matching "red flags" that Franchisor and Franchisee Defendants knew and acknowledged to be indicators of sex trafficking in a hotel environment.

77. Upon information and belief and based on hotel reviews, customer complaints and records of law enforcement calls, there were multiple trafficking victims exploited at the subject Holiday Inn locations named herein prior to Jane Doe (C.A.A.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

78. All knowledge from the staff at these subject Holiday Inn locations is imputed to Franchisee Defendants. Holiday Inn Franchisee Defendants knew about this widespread and ongoing trafficking at these Holiday Inn locations, including the trafficking of Jane Doe (C.A.A.), through the direct observations of hotel staff, including management-level staff. This knowledge is further imputed to IHG Franchisor Defendants based on the existence of an agency relationship as described below.

22

79. Upon information and belief, in addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, the IHG Franchisor Defendants and Holiday Inn Franchisees learned or should have learned about the obvious signs of widespread trafficking at the subject Holiday Inn locations, based on non-public sources of information including but not limited to:

   a. Surveillance of the property;

   b. Internal investigations;

   c. Customer complaints;

   d. Monitoring of customer feedback;

   e. Information received from law enforcement;

   f. And other sources of non-public information available to Franchisees.

80. Upon information and belief, IHG Franchisor Defendants knew or should have known about the widespread trafficking at the subject Holiday Inn locations referenced herein, based on:

   a. The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the Franchisor Defendants;

   b. The IHG Franchisor Defendants' regular monitoring of online reviews;

   c. The IHG Franchisor Defendants' collection and monitoring of customer surveys and complaints;

   d. The IHG Franchisor Defendants' requirement that franchisees submit regular and detailed reports to their IHG Franchisor Defendants about day-to-day hotel operations;

   e. The IHG Franchisor Defendants' regular inspections of the hotel property;

   f. The IHG Franchisor Defendants' use of field agents who worked directly with the subject locations, including through on-site work on security issues;

23

g. The IHG Franchisor Defendants' collection and monitoring of data about guests at the subject locations, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

h. The IHG Franchisor Defendants' supervision and control over day-to-day operations of the subject locations through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisees to use and through which franchisees were obligated to allow Franchisor Defendants to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

i. The IHG Franchisor Defendants' access to surveillance and security systems;

j. Information provided to the IHG Franchisor Defendants by law enforcement; and

k. Other sources of information available to Defendants.

81. Upon information and belief, under the IHG Franchisor Defendants' protocols, which on their face required hotel staff and management and Holiday Inn Franchisee Defendants to report suspected criminal activity to the IHG Franchisor Defendants, hotel staff and management and Holiday Inn Franchisee Defendants were required to report and did report numerous instances of suspected sex trafficking to the IHG Franchisor Defendants prior to Jane Doe (C.A.A.)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the subject Holiday Inn locations.

82. Upon Information and belief, the IHG Franchisor Defendants observed obvious "red flags" of numerous instances of sex trafficking occurring at the subject Holiday Inn locations based on their supervision and monitoring of the property.

**d. Defendants knew Jane Doe (C.A.A.) was being trafficked at the subject Hyatt location because of the apparent and obvious "red flags" of sex trafficking.**

83. During the period that Jane Doe (C.A.A.) was trafficked at the subject Hyatt location named herein, there were obvious signs that her trafficker was engaged in sex trafficking:

a. Jane Doe (C.A.A.) was escorted and monitored by her trafficker or his associate while on the premise of the subject hotel;

24

b. Jane Doe (C.A.A.) appeared disheveled, high on drugs, "completely out of it" and with apparent bruises on her body;

c. Jane Doe (C.A.A.) was forced to wear sunglasses to cover bruises and appeared in front of hotel staff with sunglasses at strange and peculiar times;

d. Jane Doe (C.A.A.) was brutally beaten in the parking lot of the subject Hyatt by her trafficker leaving apparent bruises that were observed by hotel staff;

e. The hotel rooms in which she was trafficked were paid for with cash, even though the reservation was originally booked online;

f. The hotel rooms in which Jane Doe (C.A.A.) was trafficked were paid for by a third-party and often multiple rooms were rented at once to operate multiple sex-buyers;

g. Jane Doe (C.A.A.) arrived with her trafficker and one other woman, who all went in and out of the room to the parking lot multiple times during the stay, often going past the front desk where front desk workers were performing their duties;

h. Jane Doe (C.A.A.)'s trafficker would remain in the hall way or the parking lot;

i. At least one other woman was trafficked at the same hotel at the same time as Jane Doe (C.A.A.), and also was exhibiting the same red flags of trafficking that Jane Doe (C.A.A.) was exhibiting at the same time;

j. Jane Doe (C.A.A.) would place the towels outside the door and constantly ask for fresh towels and sheets;

k. The trafficker and the other woman who was being trafficked would linger around the hotel or in the parking lot while Jane Doe (C.A.A.) was with a sex-buyer;

l. Jane Doe (C.A.A.) was constantly dressed in provocative clothing and would sometimes walk different sex-buyer past the front desk and to the hotel room;

m. There was heavy foot traffic in and out of Jane Doe (C.A.A.)'s room involving men who were not hotel guests, who had to pass the hotel front desk to get to the room that Jane Doe (C.A.A.) was staying in;

n. Jane Doe (C.A.A.) had around five to six johns during her stay, and these individuals entered and left at unusual hours and were present at the hotel for only brief periods of time; and

o. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

84.   Multiple employees at the subject Hyatt location named herein, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

85.   On the occasion, after Jane Doe (C.A.A.) was attacked, physically beaten, and dragged into the hotel room, a hotel employee brought her some personal belongings, stating they had been found near the trash bin in the back where the assault occurred. The hotel employee did not call the police or offer help to Jane Doe (C.A.A.) despite apparent injury to her body.

86.   Following the assault, Jane Doe (C.A.A.) was compelled to continue engaging in commercial sex while visibly injured, with additional sex buyers—none of whom were registered hotel guests—arriving at the hotel room.

87.   As such, Hyatt Franchisee Defendant knew or was willfully blind to the fact that Jane Doe (C.A.A.) was being trafficked at the subject Hyatt property.

88.   Given these obvious signs, Hyatt knew or should have known about the trafficking of Jane Doe (C.A.A.) based on their policies or protocols that required hotel staff and Hyatt Franchisee Defendant to report suspected criminal activity including sex trafficking.

89.   The Hyatt Franchisor Defendant and Hyatt Franchisee Defendant had constructive knowledge of the trafficking of Jane Doe (C.A.A.) at the Subject Hyatt location because her trafficking was the direct result of the Hyatt Franchisor and Franchisee Defendants facilitating trafficking at the Subject Hyatt location.

90.   The Hyatt Franchisor Defendant had knowledge of the incident because, upon information and belief, the Hyatt Franchisee Defendant is required by agreement to report incidents to the Hyatt Franchisor Defendant.

26

91.     Based on their knowledge of the problem of sex trafficking in the hotel industry, at Hyatt branded hotels, and at their Subject Hyatt location, Hyatt Franchisor and Hyatt Franchisee Defendants each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the subject Hyatt location, and to make a reasonable investigation in response to signs of potential sex trafficking.

**e. Defendants knew Jane Doe (C.A.A.) was being trafficked at the Addison Holiday Inn location because of the apparent and obvious "red flags" of sex trafficking.**

92.     During the period that Jane Doe (C.A.A.) was trafficked at the Addison Holiday Inn location named herein, there were obvious signs that her trafficker was engaged in sex trafficking and not commercial sex:

a. Jane Doe (C.A.A.) arrived on the premise with an escort, did not make eye contact and had visible signs of abuse, including visible body bruising;

b. Jane Doe (C.A.A.) was so intoxicated on drugs she would have difficult walking or communicating;

c. The hotel rooms in which she was trafficked were paid for with cash, even though the reservation was originally booked online;

d. Jane Doe (C.A.A.) arrived with her trafficker and one other woman, who all went in and out of the room to the parking lot multiple times during the stay, often going past the front desk where front desk workers were performing their duties;

e. At least one other woman was trafficked at the same hotel at the same time as Jane Doe (C.A.A.), and also was exhibiting the same red flags of trafficking that Jane Doe (C.A.A.) was exhibiting at the same time;

f. Jane Doe (C.A.A.) would place the towels outside the door and constantly ask for fresh towels and sheets;

g. The trafficker and the other woman who was being trafficked would linger around the hotel or in the parking lot while Jane Doe (C.A.A.) was with a john;

h. Jane Doe (C.A.A.) was constantly dressed in provocative clothing and would sometimes walk different johns past the front desk and to the hotel room;

i. There was heavy foot traffic in and out of Jane Doe (C.A.A.)'s room involving men who were not hotel guests, who had to pass the hotel front desk to get to the room that Jane Doe (C.A.A.) was staying in;

27

j. Jane Doe (C.A.A.) had around five to six johns during her stay, and these individuals entered and left at unusual hours and were present at the hotel for only brief periods of time; and

93. Multiple employees at the subject Holiday Inn locations named herein, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

94. As such, Holiday Inn Franchisee Defendants knew or was willfully blind to the fact that Jane Doe (C.A.A.) was being trafficked at the Addison Holiday Inn property.

95. Given these obvious signs, IHG knew or should have known about the trafficking of Jane Doe (C.A.A.) based on their policies or protocols that required hotel staff and Holiday Inn Franchisee Defendants to report suspected criminal activity including sex trafficking.

96. The IHG Franchisor and Holiday Inn Franchisee Defendants had constructive knowledge of the trafficking of Jane Doe (C.A.A.) at the Addison Holiday Inn locations because that trafficking was the direct result of the IHG Franchisor and Holiday Inn Franchisee Defendants facilitating trafficking at the Addison Holiday Inn location.

97. Based on their knowledge of the problem of sex trafficking in the hotel industry, at IHG branded hotels, and at this specific Addison Holiday Inn location, IHG Franchisor and Holiday Inn Franchisee Defendants each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the Addison hotel and to make a reasonable investigation in response to signs of potential sex trafficking. If the IHG Franchisor and Holiday Inn Franchisee Defendants had used reasonable prudence, they would have been aware of Jane Doe (C.A.A.)'s trafficking at the Addison Holiday Inn location and that they were benefiting from such trafficking.

28

**f. Defendants knew Jane Doe (C.A.A.) was being trafficked at the Garland Holiday Inn location because of the apparent and obvious "red flags" of sex trafficking.**

98.  During the three-day period that Jane Doe (C.A.A.) was trafficked at the Garland Holiday Inn location named herein, there were obvious signs that her trafficker was engaged in sex trafficking, not commercial sex:

a.  The hotel rooms in which she was trafficked were paid for with cash, even though the reservation was originally booked online;

b.  Jane Doe (C.A.A.) was involved in an incident where she was badly beaten immediately prior to arriving at the Garland Holiday Inn and arrived with apparent signs of physical assault;

c.  Jane Doe (C.A.A.) was inebriated to the point of not being able to walk or communicate without assistance;

d.  Jane Doe (C.A.A.) arrived with her trafficker and one other woman, who all went in and out of the room to the parking lot multiple times during the stay, often going past the front desk where front desk workers were performing their duties;

e.  At least one other woman was trafficked at the same hotel at the same time as Jane Doe (C.A.A.), and also was exhibiting the same red flags of trafficking that Jane Doe (C.A.A.) was exhibiting at the same time;

f.  Jane Doe (C.A.A.) would place the towels outside the door and constantly ask for fresh towels and sheets, but would refuse to allow housekeeping to come inside to clean the room;

g.  The trafficker and the other woman who was being trafficked would linger around the hotel or in the parking lot while Jane Doe (C.A.A.) was with a john;

h.  In the parking lot of the Garland Holiday Inn, Jane Doe (C.A.A.) was involved in a violent confrontation with her trafficker wherein the trafficker attempted to strike her with a truck before forcing her back into the room, where additional sex buyers subsequently arrived;

i.  Jane Doe (C.A.A.) was constantly dressed in provocative clothing and would sometimes walk different johns past the front desk and to the hotel room;

j.  There was heavy foot traffic in and out of Jane Doe (C.A.A.)'s room involving men who were not hotel guests, who had to pass the hotel front desk to get to the room that Jane Doe (C.A.A.) was staying in;

29

k. Jane Doe (C.A.A.) had around five to six johns per day during her stay, and these individuals entered and left at unusual hours and were present at the hotel for only brief periods of time; and

99. Multiple employees at the subject Holiday Inn locations named herein, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

100. As such, Holiday Inn Franchisee Defendants knew or was willfully blind to the fact that Jane Doe (C.A.A.) was being trafficked at the Garland Holiday Inn property.

101. Given these obvious signs, IHG knew or should have known about the trafficking of Jane Doe (C.A.A.) based on their policies or protocols that required hotel staff and Holiday Inn Franchisee Defendants to report suspected criminal activity including sex trafficking.

102. The IHG Franchisor and Holiday Inn Franchisee Defendants had constructive knowledge of the trafficking of Jane Doe (C.A.A.) at the Garland Holiday Inn location because that trafficking was the direct result of the IHG Franchisor and Holiday Inn Franchisee Defendants facilitating trafficking at the Garland Holiday Inn location.

103. Based on their knowledge of the problem of sex trafficking in the hotel industry, at IHG branded hotels, and at this specific Garland Holiday Inn location, IHG Franchisor and Holiday Inn Franchisee Defendants each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the Garland hotel and to make a reasonable investigation in response to signs of potential sex trafficking. If the IHG Franchisor and Holiday Inn Franchisee Defendants had used reasonable prudence, they would have been aware of Jane Doe (C.A.A.)'s trafficking at the Garland Holiday Inn location and that they were benefiting from such trafficking.

IV. **Hyatt and IHG Defendants actively facilitated sex trafficking at their subject Hyatt and Holiday Inn locations, including the trafficking of Jane Doe (C.A.A.).**

30

104. Hyatt and IHG Defendants had both actual and constructive knowledge of the trafficking of Jane Doe (C.A.A.) at their Subject Hyatt and Holiday Inn locations because the trafficking was a direct result of Hyatt and IHG Defendants facilitating her trafficking at their respective properties.

**a. Hyatt Franchisee Defendant facilitated the trafficking activity at the Subject Hyatt location, including the trafficking of Jane Doe (C.A.A.).**

105. Hyatt Franchisee Defendant is responsible for the acts, omissions, and knowledge of all employees of the subject Hyatt location when operating the hotel because these acts and omissions were committed in the course and scope of employment, because the Hyatt Franchisee Defendant ratified these acts and omissions, and because the Hyatt Franchisee Defendant failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to the Hyatt Franchisee Defendant, of sex trafficking occurring at the subject Hyatt location.

106. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Hyatt location, the Hyatt Franchisee Defendant continued renting rooms to these traffickers, including Jane Doe (C.A.A.)'s trafficker and including the rooms used to sexually exploit Jane Doe (C.A.A).

107. Hyatt Franchisee Defendant knew or were willfully blind to the fact that Jane Doe (C.A.A.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (C.A.A.)'s sexual exploitation.

108. Hyatt Franchisee Defendant also facilitated the harboring, providing, maintenance, and exploitation of Jane Doe (C.A.A.) and other victims at the subject Hyatt location when it continued to provide rooms where they were imprisoned and exploited despite actual knowledge

of or willful blindness to the fact that these victims were being trafficked at the subject Hyatt location.

109.    The Hyatt Franchisee Defendant also facilitated widespread trafficking at the subject Hyatt location, including the trafficking of Jane Doe (C.A.A.), in ways including:

   a. Failing to adequately enforce policies, procedures and practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to on-premises crime and specifically human trafficking;

   b. Continuing to provide services and assistance to traffickers after observing obvious "red flags" of sex trafficking;

   c. Following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site; and

   d. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

110.    The Hyatt Franchisee Defendant knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

111.    Policies purportedly enacted and enforced by the Hyatt Franchisor to identify signs of sex trafficking and stop it from occurring were not properly implemented at their Subject Hyatt location by either Franchisor or Franchisee Defendants. Jane Doe (C.A.A.)'s  trafficker was able to continue the trafficking venture at the Subject Hyatt location. Had they Hyatt Franchisor Defendant enforced their policies and procedures they enacted to prevent trafficking from occurring within their branded hotels after observing an obvious sign of trafficking as described above,  Jane Doe (C.A.A.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Subject Hyatt location. Furthermore, had Franchisee Defendant properly followed the franchise policies enacted by their Franchisors to identify and

prevent trafficking from occurring at branded hotels as described above, Jane Doe (C.A.A.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Subject Hyatt locations.

**b. The Hyatt Franchisor Defendant facilitated the trafficking activity at the Subject Hyatt location, including the trafficking of Jane Doe (C.A.A.).**

112. Hyatt Franchisor Defendant participated directly in aspects of the operation of their subject Hyatt property that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Jane Doe (C.A.A.), as follows:

a. Assuming joint responsibility with their franchisee for detecting and preventing human trafficking at the hotel property;

b. Assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to their franchisor;

c. Assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

d. Assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

e. Employing field-based associates who work with hotels on trafficking issues;

f. Assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

g. Establishing systems for guests to report security issues to their franchisor;

h. Requiring their franchisee to provide Wi-Fi/internet access to guests;

i. Mandating the specific tools and systems that their franchisee must use to provide Wi-Fi/internet access to guests;

j. Setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

k. Requiring their franchisee to use a system to monitor and track housekeeping requests;

 l. Setting policies for when and how housekeeping services are provided;

 m. Collecting and monitoring data that shows patterns of use of housekeeping services; and

 n. Setting policies for when and how hotel staff can accept tips.

113. Hyatt Franchisor Defendants directly participated in and retained day-to-day control over renting rooms at the subject Hyatt location by, among other things:

 a. Controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

 b. Reserving rooms and accept payments without requiring franchisees approval or involvement;

 c. Controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation;

 d. Requiring the franchisee to use a software system operated and controlled by their franchisor for booking rooms and checking guests into rooms;

 e. Requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

 f. Controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification;

 g. Requiring the franchisee to use a property-management system operated and controlled by the franchisor;

 h. Requiring the franchisee to use a data-management system operated and controlled by the franchisor;

 i. Ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

 j. Exercising control over the price of rooms;

 k. Controlling all details of the customer loyalty program that the franchisee was required to implement;

 l. Setting detailed policies for the check-in process, including requirements for identification and payment methods;

34

m. Collecting guest data, requiring their franchisee to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

n. Assuming sole ownership over all guest information;

o. Overseeing do not rent (DNR) lists for its branded properties.

114. The Hyatt Franchisor Defendant had a direct business relationship with traffickers operating at their subject Hyatt location because, among other things, the Hyatt Franchisor Defendant directly rented rooms at the hotels, directly received payment, and received real-time guest information. Traffickers further developed a business relationship with the Franchisor Defendant by developing brand loyalty and intentionally choosing Hyatt hotels because it was known they created a favorable environment for trafficking.

115. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Hyatt location named herein, The Hyatt Franchisor Defendant continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (C.A.A.).

116. Hyatt Franchisor Defendant knew or should have known that Jane Doe (C.A.A.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing them motel rooms and related services to facilitate Jane Doe (C.A.A.)'s sexual exploitation.

117. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the subject Hyatt location, the Hyatt Franchisor Defendant continued participating in a venture at these hotels, with its franchisee and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

35

a. Adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's trafficker, to secure rooms without providing their own identifying information;

b. Adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's trafficker, to pay for rooms using non-traceable methods;

c. Adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

d. Adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

e. Providing traffickers continued access to Franchisor-maintained internet systems despite having active or constructive knowledge this access was being used for advertising services related to their trafficking activities;

f. Adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at subject Hyatt location; and

g. Implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking;

118. If the Hyatt Franchisor Defendant had exercised reasonable diligence when operating their Hyatt property and in the areas where it retained control, Hyatt Franchisor Defendant would have prevented the subject Hyatt location from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (C.A.A.). Instead, Hyatt Franchisor Defendant engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (C.A.A.).

119. The Hyatt Franchisor Defendant should have known about C.A.A.'s trafficking because it retained control over the training of the staff of their Subject Hyatt location regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation

and human trafficking. If the Hyatt Franchisor Defendant had exercised reasonable diligence in providing training, they would have known about the obvious and apparent sex trafficking, including the trafficking of Jane Doe (C.A.A.) at the Subject Hyatt location. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Hyatt Franchisor Defendant.

120.    The Hyatt Franchisor Defendant should have known about Jane Doe (C.A.A.)'s trafficking because they also retained control over the response of their Hyatt hotels to human trafficking, including development of policies and procedure regarding detection, disruption of and response to human trafficking. By failing to exercise reasonable diligence in discharge of this duty, the Hyatt Franchisor Defendants facilitated sex trafficking, including the sex trafficking of Jane Doe (C.A.A.) in their hotel. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Hyatt Franchisor Defendants.

121.    The Hyatt Franchisor Defendants also should have known about Jane Doe (C.A.A.)'s  trafficking because they retained the control to adopt and enforce policies on sex trafficking for their properties, including the Subject Hyatt location, adopted and enforced inadequate and inappropriate check-in, payment, and identification policies, which facilitated trafficking at the Subject Hyatt location. The Hyatt Franchisor Defendants and allowed traffickers to access rooms for the purpose of harboring their victims, including Jane Doe (C.A.A.). Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Hyatt Franchisor Defendant.

122.    The Hyatt Franchisor Defendant also should have known about Jane Doe (C.A.A.)'s trafficking because they retained control over the security of their Subject Hyatt location through various means including, upon information and belief, placing and monitoring

security cameras, accepting and reviewing and responding to customer complaints, and inspecting their Subject hotel. They also collected data regarding hotel operations and customers, including names, payment information, payment method, reservation history, wi-fi browsing data, and other details associated with their stay. If the Hyatt Franchisor Defendant had used reasonable prudence in monitoring and reviewing this information, they would have known about the ongoing trafficking. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Hyatt Franchisor Defendants.

123.    Jane Doe (C.A.A.) exhibited the kind of obvious signs of sex trafficking that would have been detectable and detected if the Hyatt Franchisor Defendants had used reasonable diligence in the aspects of hotel operations over which they retained control.

124.    Moreover, Jane Doe (C.A.A.)'s trafficker was able to operate without interference and without making significant effort at a concealment during repeated visits to their Subject Hyatt location over an extended period because the Hyatt Franchisor Defendant adopted policies and practices that insulated Jane Doe (C.A.A.)'s trafficker from significant risk of detection or disruption.

   c.  **Holiday Inn Franchisee Defendants facilitated the trafficking activity at the Subject Holiday Inn locations, including the trafficking of Jane Doe (C.A.A.).**

125.    Holiday Inn Franchisee Defendants are responsible for the acts, omissions, and knowledge of all employees of these Holiday Inn locations when operating the hotel because these acts and omissions were committed in the course and scope of employment, because the Holiday Inn Franchisee Defendants ratified these acts and omissions, and because the Holiday Inn Franchisee Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to the Holiday Inn Franchisee Defendants, of sex trafficking occurring at these Holiday Inn locations.

126.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Holiday Inn locations, Franchisee Defendants continued renting rooms to these traffickers, including Jane Doe (C.A.A.)'s trafficker and including the rooms used to sexually exploit Jane Doe (C.A.A).

127.     Holiday Inn Franchisee Defendants knew or were willfully blind to the fact that Jane Doe (C.A.A.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (C.A.A.)'s sexual exploitation.

128.     Holiday Inn Franchisee Defendants also facilitated the harboring, providing, maintenance, and exploitation of Jane Doe (C.A.A.) and other victims at the subject Holiday Inn locations when it continued to provide rooms where they were imprisoned and exploited despite actual knowledge of or willful blindness to the fact that these victims were being trafficked at the subject Holiday Inn locations.

129.     Franchisee Defendants also facilitated widespread trafficking at their subject Holiday Inn locations, including the trafficking of Jane Doe (C.A.A.), in ways including:

a.   Failing to adequately enforce policies, procedures and practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to on-premises crime and specifically human trafficking;

b.   Continuing to provide services and assistance to traffickers after observing obvious "red flags" of sex trafficking;

c.   Following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site; and

d.   implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

130. The Holiday Inn Franchisees knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

131. Policies purportedly enacted and enforced by IHG Franchisor Defendants to identify signs of sex trafficking and stop it from occurring were not properly implemented at their Subject Holiday Inn locations by either Franchisor Defendants or Franchisees. Jane Doe (C.A.A.)'s trafficker was able to continue the trafficking venture at the Subject Holiday Inn locations. Had Franchisor Defendants enforced their policies and procedures they enacted to prevent trafficking from occurring within their branded hotels after observing an obvious sign of trafficking as described above, Jane Doe (C.A.A.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Subject Holiday Inn locations. Furthermore, had Franchisee Defendants properly followed the franchise policies enacted by their Franchisors to identify and prevent trafficking from occurring at branded hotels as described above, Jane Doe (C.A.A.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Subject Holiday Inn locations.

**d. The IHG Franchisor Defendants facilitated the trafficking activity at their Subject Holiday Inn locations, including the trafficking of Jane Doe (C.A.A.).**

132. IHG Franchisor Defendants participated directly in aspects of the operation of their subject Holiday Inn properties that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Jane Doe (C.A.A.), as follows:

   a. Assuming joint responsibility with their franchisees for detecting and preventing human trafficking at the hotel property;

   b. Assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to their franchisor;

40

c. Assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

d. Assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

e. Employing field-based associates who work with hotels on trafficking issues;

f. Assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

g. Establishing systems for guests to report security issues to their franchisor;

h. Requiring their franchisees to provide Wi-Fi/internet access to guests;

i. Mandating the specific tools and systems that their franchisees must use to provide Wi-Fi/internet access to guests;

j. Setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage

k. Requiring their franchisees to use a system to monitor and track housekeeping requests;

l. Setting policies for when and how housekeeping services are provided;

m. Collecting and monitoring data that shows patterns of use of housekeeping services; and

n. Setting policies for when and how hotel staff can accept tips.

133. IHG Franchisor Defendants directly participated in and retained day-to-day control over renting rooms at their subject Holiday Inn locations by, among other things:

a. Controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b. Reserving rooms and accept payments without requiring franchisees approval or involvement;

c. Controlling and restricting the ability of franchisees and staff to refuse or cancel a reservation;

41

d.  Requiring the franchisees to use a software system operated and controlled by their franchisor for booking rooms and checking guests into rooms;

e.  Requiring their franchisees to use a software system operated and controlled by the franchisor to process payments;

f.  Controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification;

g.  Requiring their franchisees to use a property-management system operated and controlled by the franchisor;

h.  Requiring their franchisees to use a data-management system operated and controlled by the franchisor;

i.  Ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

j.  Exercising control over the price of rooms;

k.  Controlling all details of the customer loyalty program that the franchisees were required to implement;

l.  Setting detailed policies for the check-in process, including requirements for identification and payment methods;

m.  Collecting guest data, requiring their franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

n.  Assuming sole ownership over all guest information; and

o.  Overseeing do not rent (DNR) lists for its branded properties.

134.  The IHG Franchisor Defendants had a direct business relationship with traffickers operating at their subject Holiday Inn locations because, among other things, the IHG Franchisor Defendants directly rented rooms at the hotels, directly received payment, and received real-time guest information. Traffickers further developed a business relationship with the Franchisor Defendants by developing brand loyalty and intentionally choosing IHG hotels because it was known they created a favorable environment for trafficking.

42

135.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Holiday Inn locations named herein, Franchisor Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (C.A.A.).

136.    IHG Franchisor Defendants knew or should have known that Jane Doe (C.A.A.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing them motel rooms and related services to facilitate Jane Doe (C.A.A.)'s sexual exploitation.

137.    Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the subject Holiday Inn locations, the IHG Franchisor Defendants continued participating in a venture at these hotels, with its franchisees and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

   a.  Adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's trafficker, to secure rooms without providing their own identifying information;

   b.  Adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's trafficker, to pay for rooms using non-traceable methods;

   c.  Adopting and enforcing training methods for the franchisees and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

   d.  Adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

   e.  Providing traffickers continued access to Franchisor-maintained internet systems despite having active or constructive knowledge this access was being used for advertising services related to their trafficking activities;

43

**f.** Adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisees and hotel staff related to human trafficking at the subject Holiday Inn locations;

**g.** Implicitly or explicitly encouraging franchisees to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking;

138.    If IHG Franchisor Defendants had exercised reasonable diligence when operating their Holiday Inn properties and in the areas where it retained control, Franchisor Defendants would have prevented the subject Holiday Inn locations from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (C.A.A.). Instead, IHG Franchisor Defendants engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (C.A.A.).

139.    The IHG Franchisor Defendants should have known about Jane Doe (C.A.A.)'s trafficking because it retained control over the training of the staff of their Subject Holiday Inn locations regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If the IHG Franchisor Defendants had exercised reasonable diligence in providing training, they would have known about the obvious and apparent sex trafficking, including the trafficking of Jane Doe (C.A.A.) at the Subject Holiday Inn locations. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the  IHG Franchisor Defendants.

140.    The IHG Franchisor Defendants should have known about Jane Doe (C.A.A.)'s trafficking because they also retained control over the response of their IHG  hotels to human trafficking, including development of policies and procedure regarding detection, disruption of and response to human trafficking. By failing to exercise reasonable diligence in discharge of this

44

duty, the IHG Franchisor Defendants facilitated sex trafficking, including the sex trafficking of Jane Doe (C.A.A.) in their hotel. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the IHG Franchisor Defendants.

141.    The IHG Franchisor Defendants also should have known about Jane Doe (C.A.A.)'s  trafficking because they retained the control to adopt and enforce policies on sex trafficking for their properties, including their Subject Holiday Inn locations, adopted and enforced inadequate and inappropriate check-in, payment, and identification policies, which facilitated trafficking at their Subject Holiday Inn locations. The IHG Franchisor Defendants and allowed traffickers to access rooms for the purpose of harboring their victims, including Jane Doe (C.A.A.). Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the IHG Franchisor Defendants.

142.    The IHG Franchisor Defendants also should have known about Jane Doe (C.A.A.)'s trafficking because they retained control over the security of their Subject Holiday Inn locations through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing and responding to customer complaints, and inspecting their Subject hotels. They also collected data regarding hotel operations and customers, including names, payment information, payment method, reservation history, wi-fi browsing data, and other details associated with their stay. If the IHG Franchisor Defendants had used reasonable prudence in monitoring and reviewing this information, they would have known about the ongoing trafficking. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the IHG Franchisor Defendants.

143.    Jane Doe (C.A.A.) exhibited the kind of obvious signs of sex trafficking that would have been detectable and detected if the IHG Franchisor Defendants had used reasonable diligence in the aspects of hotel operations over which they retained control.

144.    Moreover, Jane Doe (C.A.A.)'s trafficker was able to operate without interference and without making significant effort at a concealment during repeated visits to their Subject Holiday Inn locations over an extended period because the IHG Franchisor Defendants adopted policies and practices that insulated Jane Doe (C.A.A.)'s trafficker from significant risk of detection or disruption.

## V.    Hyatt Franchisor and Franchisee Defendants' ventures at the subject Hyatt property.

145.    The Hyatt Franchisor Defendant generated substantial income from their subject Hyatt location. The fees generated by the Hyatt Franchisor Defendant were primarily based on gross room rentals; therefore, the Hyatt Franchisor Defendant's profits increased with each room rental at their Subject Hyatt location, including each room rented to a trafficker. Revenue generated from rooms rented at their Subject Hyatt location was distributed among the Hyatt Franchisor Defendant, with each benefiting from each rental of a hotel room to a trafficker, including Jane Doe (C.A.A.)'s trafficker.

146.    The Hyatt Franchisee profited from every room rented to a trafficker or for use in trafficking at their Subject Hyatt location, both from the room fee and from fees for other hotel services.

147.    In ways described more fully above, the Hyatt Franchisor Defendant and Franchisee knowingly received a financial benefit from participating in a venture in the form of a continuous business relationship and implicit understanding with the population of sex traffickers

operating out of their Subject Hyatt location including Jane Doe (C.A.A.)'s trafficker. (hereinafter "**Venture 1**").

148.    The Hyatt Franchisor Defendant and Franchisee formed this continuous business relationship and implicit understanding with the traffickers at their Subject Hyatt location by continuing to rent rooms to be used for trafficking (including C.A.A.'s trafficking) after the Hyatt Franchisor Defendant and Franchisee knew or should have known that the rooms were being used for unlawful trafficking.

149.    This business relationship involved mutual pursuant of financial benefit: the trafficker was renting the hotel rooms to generate revenue from sex trafficking and the Hyatt Franchisor Defendant and Franchisee were generating revenue by renting the hotel rooms.

150.    The implicit understanding developed because sex traffickers, including Jane Doe (C.A.A.)'s, frequently used the Subject Hyatt location for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the Hyatt Franchisor Defendant and Franchisee that created a favorable environment for sex trafficking to flourish.

151.    Both the Hyatt Franchisor Defendant and their Franchisee participated in this venture by acting jointly to rent rooms to traffickers and to operate the hotel in a way that attracted business from traffickers and facilitated their trafficking activity. As further described above, Franchisee provided "boots on the ground" at the hotel, and the Hyatt Franchisor Defendant played a primary role in renting rooms at the Subject Hyatt location and retained control over and was directly involved in aspects of hotel operations related to sex trafficking.

152.    The Hyatt Franchisor Defendant and Franchisee participated in the venture by continually renting rooms to traffickers, including Jane Doe (C.A.A.)'s, after they knew or should

47

have known that victims like Jane Doe (C.A.A.) were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known would encourage traffickers to select the Subject Hyatt location as a venue for their illegal activities.

153.    Hyatt Franchisor Defendant and their Franchisee did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

   a.  The population of traffickers, including Jane Doe (C.A.A.)'s, were familiar to the staff at the Subject Hyatt location;

   b.  These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the Subject Hyatt location but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

   c.  Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties;

   d.  Defendants provided additional services to traffickers (including Jane Doe (C.A.A.)'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms; and

   e.  The staff designated an area of the hotel, in the back of a hallway but near an unlocked door, for traffickers, which facilitated their illegal activities.

154.    The criminal traffickers operating at the Subject Hyatt location as part of Venture 1 violated 18 U.S.C. §1591 as to victims including Jane Doe (C.A.A.).

155.    If the Hyatt Franchisor Defendant and Franchisee had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from Jane Doe (C.A.A.)'s trafficking at Subject Hyatt location.

48

156. In ways described more fully above, the Hyatt Franchisor Defendant and Franchisee also knowingly received a financial benefit from participating in a commercial hotel-operating venture at the Subject Hyatt location (hereinafter "**Venture 2**").

157. The Hyatt Franchisor Defendant and their Franchisee had a longstanding business relationship pursuant to which they jointly participated in operation of the Subject Hyatt location with a shared goal of maximizing revenue, including gross room revenue.

158. The Hyatt Franchisor Defendant and their Franchisee, through their respective roles in hotel operations as described above, facilitated widespread sex trafficking at their Subject Hyatt location by continuing to operate the hotel in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site at these hotels.

159. Venture 2 was engaged in a violation of the TVRPA through the widespread sex trafficking at the Subject Hyatt location, which resulted in Jane Doe (C.A.A.) and other victims being harbored, maintained, and provided in the rooms of the Subject Hyatt location. Venture 2 also engaged in a violation of the TVPRA through the actions of the Franchisee who violated the TVPRA as a perpetrator by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

160. Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Hyatt Franchisor Defendant and their Franchisee participated in the venture by continuing to operate their Subject Hyatt location in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe (C.A.A.). The Hyatt Franchisor Defendant provided their Franchisee with operational support, use of trademarks, marketing services, and other resources to

operate their Subject Hyatt location in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

### VI. IHG Franchisor and Franchisee Defendants' ventures at the Holiday Inn properties.

161. IHG Franchisor Defendants generated substantial income from their subject Holiday Inn locations. The fees generated by the IHG Franchisor Defendants were primarily based on gross room rentals; therefore, the IHG Franchisor Defendants' profits increased with each room rental at their Subject Holiday Inn locations, including each room rented to a trafficker. Revenue generated from rooms rented at their Subject Holiday Inn locations was distributed among the IHG Franchisor Defendants, with each benefiting from each rental of a hotel room to a trafficker, including Jane Doe (C.A.A.)'s trafficker.

162. Holiday Inn Franchisees profited from every room rented to a trafficker or for use in trafficking at their Subject Holiday Inn locations, both from the room fee and from fees for other hotel services.

163. In ways described more fully above, the IHG Franchisor Defendants and Holiday Inn Franchisees knowingly received a financial benefit from participating in a venture in the form of a continuous business relationship and implicit understanding with the population of sex traffickers operating out of their Subject Holiday Inn locations including Jane Doe (C.A.A.)'s trafficker. (hereinafter "**Venture 1**").

164. The IHG Franchisor Defendants and their Franchisees formed this continuous business relationship and implicit understanding with the traffickers at their Subject Holiday Inn locations by continuing to rent rooms to be used for trafficking (including C.A.A.'s trafficking) after the IHG Franchisor Defendants and their Franchisees knew or should have known that the rooms were being used for unlawful trafficking.

165.    This business relationship involved mutual pursuant of financial benefit: the trafficker was renting the hotel rooms to generate revenue from sex trafficking and the IHG Franchisor Defendants and their Franchisees were generating revenue by renting the hotel rooms.

166.    The implicit understanding developed because sex traffickers, including Jane Doe (C.A.A.)'s, frequently used the Subject Holiday Inn locations for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the IHG Franchisor Defendants and Franchisees that created a favorable environment for sex trafficking to flourish.

167.    Both IHG Franchisor Defendants and their Franchisees participated in this venture by acting jointly to rent rooms to traffickers and to operate the hotel in a way that attracted business from traffickers and facilitated their trafficking activity. As further described above, Franchisees provided "boots on the ground" at the hotel, and the IHG Franchisor Defendants played a primary role in renting rooms at the Subject Holiday Inn locations and retained control over and was directly involved in aspects of hotel operations related to sex trafficking.

168.    The IHG Franchisor Defendants and Franchisees participated in the venture by continually renting rooms to traffickers, including Jane Doe (C.A.A.)'s, after they knew or should have known that victims like Jane Doe (C.A.A. ) were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known would encourage traffickers to select the Subject Holiday Inn locations as a venue for their illegal activities.

169.    IHG Franchisor Defendants and their Franchisees did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business

51

as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

f.   The population of traffickers, including Jane Doe (C.A.A.)'s, were familiar to the staff at the Subject Holiday Inn locations;

g.   These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the Subject Holiday Inn locations but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

h.   Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties;

i.   Defendants provided additional services to traffickers (including Jane Doe (C.A.A.)'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms; and

j.   The staff designated an area of the hotel, in the back of a hallway but near an unlocked door, for traffickers, which facilitated their illegal activities

170.   The criminal traffickers operating at the Subject Holiday Inn locations as part of Venture 1 violated 18 U.S.C. §1591 as to victims including Jane Doe (C.A.A.).

171.   If IHG Franchisor Defendants and their Franchisees had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from Jane Doe (C.A.A.)'s trafficking at Subject Holiday Inn locations.

172.   In ways described more fully above, the IHG Franchisor Defendants and their Franchisees also knowingly received a financial benefit from participating in a commercial hotel-operating venture at their Subject Holiday Inn locations (hereinafter "**Venture 2**").

173.   The IHG Franchisor Defendants and their Franchisees had a longstanding business relationship pursuant to which they jointly participated in operation of the Subject Holiday Inn locations with a shared goal of maximizing revenue, including gross room revenue.

52

174. They IHG Franchisor Defendants and their Franchisees, through their respective roles in hotel operations as described above, facilitated widespread sex trafficking at their Subject Holiday Inn locations by continuing to operate the hotel in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site at these hotels.

175. Venture 2 was engaged in a violation of the TVRPA through the widespread sex trafficking at the Subject Holiday Inn locations, which resulted in Jane Doe (C.A.A.) and other victims being harbored, maintained, and provided in the rooms of the Subject Holiday Inn locations. Venture 2 also engaged in a violation of the TVPRA through the actions of Franchisees who violated the TVPRA as a perpetrator by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

176. Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the IHG Franchisor Defendants and their Franchisees participated in the venture by continuing to operate their Subject Holiday Inn locations in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe (C.A.A.). The IHG Franchisor Defendants provided their Franchisees with operational support, use of trademarks, marketing services, and other resources to operate their Subject Holiday Inn locations in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

## VII. Hyatt Franchisee Defendants and the Staff at the Hyatt Location Named Herein Acted as Actual Agents of Hyatt Franchisor Defendant.

177. Hyatt Franchisor Defendant are vicariously liable for the acts, omissions, and knowledge of their Franchisee Defendant and staff at the subject Hyatt location named herein, which are Hyatt's actual agents or subagents.

178.     The Hyatt Franchisor Defendant subjected their Franchisee Defendant to detailed standards and requirements regarding the operation of the subject Hyatt location named herein, through their franchising agreements, through detailed written policies and manuals, and expectations imposed by the Hyatt Franchisor Defendant as they oversaw and supervised hotel operations.

179.     The Hyatt Franchisor Defendant obscure the full extent of control they exercise over their Franchisee by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Franchisor Defendant imposed on their Franchisee:

   a.  Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the subject Hyatt locations;

   b.  Covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, décor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions;

   c.  Dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the subject Hyatt location; and

   d.  Significantly exceeded what was necessary for Hyatt to protect its registered trademarks.

180.     In addition to the ways described above, upon information and belief, Hyatt exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of their subject Hyatt location named herein, including the following ways:

   a.  The Hyatt Franchisor Defendant required their franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Franchisor Defendants to protect their registered trademarks;

54

b. The Hyatt Franchisor Defendant maintained a team of regionally based trainers to provide training at branded hotels. Hyatt Franchisor Defendant provided training for hotel management and select hotel staff on-site and at locations selected by Franchisor;

c. The Hyatt Franchisor Defendant provided their hotels staff with training and controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

d. The Hyatt Franchisor Defendant controlled training provided by franchisee to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. The Hyatt Franchisor Defendant retained sole discretion to determine whether all training had been completed satisfactorily

f. The Hyatt Franchisor Defendant maintained oversight in hiring, disciplining, and terminating hotel management and employees;

g. The Hyatt Franchisor Defendant required their franchisee to participate in mandatory centralized services for day-to-day operation of the hotel;

h. For certain products and services that franchisees were required to purchase to operate the property, Hyatt Franchisor Defendants designated approved vendors and prohibited their franchisees from purchasing goods and services from anyone other than an approved vendor;

i. The Hyatt Franchisor Defendants required their franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at through the hotel through direct access to the system;

j. The Hyatt Franchisor Defendants set required staffing levels for the subject properties;

k. The Hyatt Franchisor Defendants established detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

l. The Hyatt Franchisor Defendant set requirements for the hiring process used by their franchisees and oversaw employee discipline processes and termination decisions;

m. The Hyatt Franchisor Defendant provided benefits for employees of franchised hotels;

n.  The Hyatt Franchisor Defendant controlled channels for guests to report complaints or provide feedback regarding their subject properties and directly participated in the response and/or supervised and the response to customer complaints or other feedback. Hyatt retained the right to provide refunds or other compensation to guests and to require Franchisee Defendants to pay associated costs;

o.  The Hyatt Franchisor Defendant generated reports and analysis of guest complaints and online reviews for their subject properties;

p.  The Hyatt and IHG Franchisor Defendant set detailed requirements for insurance that Franchisee Defendant must purchase;

q.  The Hyatt Franchisor Defendant exercised or retained control over their franchisee's day-to-day accounting and banking practices;

r.  The Hyatt Franchisor Defendant regularly audited the books and records of the Franchisee Defendant;

s.  The Hyatt Franchisor Defendant conducted frequent and unscheduled inspections of their subject property;

t.  The Hyatt Franchisor Defendant retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if their franchisees violated any of Hyatt's detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of their subject properties;

u.  The Hyatt Franchisor Defendant controlled all marketing for their subject properties, directly provided marketing services, and prohibited Franchisee Defendant from maintaining any online presence unless specifically reviewed and approved by Hyatt Defendant;

v.  The Hyatt Franchisor Defendant exercised or retained control over all aspects of building and facility design;

w.  The Hyatt Franchisor Defendant imposed detailed recordkeeping and reporting requirements on their Franchisee Defendant regarding virtually all aspects of hotel operations. The Franchisor Defendant retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

x.  Hyatt Franchisor Defendants supervised and controlled day-to-day operations of their subject property through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee Defendant to use;

56

y. Hyatt Franchisor Defendant required their franchisee and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis; and

z. Hyatt Franchisor Defendant retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

181. Upon information and belief, Hyatt Franchisor Defendant had the right to and did enforce its control over Franchisee Defendant through various methods, including:

a. The right to conduct detailed inspections of the subject properties;

b. Monitoring or auditing the Franchisee Defendant for compliance with policies and expectations;

c. Directing Franchisee Defendant to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d. Mandating training and education for franchisee and/or hotel staff;

e. Employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

f. The right to impose fines or penalties;

g. The right to impose additional conditions on franchisees or to restrict or limit its rights toprovide goods and services; and

h. The right to terminate the franchise agreements for failure to comply with policies that govern the means and methods used for day-to-day operations.

182. The Hyatt Franchisor Defendant are also vicariously liable for their Franchisee and the hotel staff because it retained and exercised control over the specific instrumentalities and aspects of operations that caused Jane Doe (C.A.A.)'s harm, including but not limited to reservations of rooms, hotel security, and detection of and response to suspected sex trafficking. Hyatt Franchisor Defendant had the right to exercise detailed, day-to-day control over and involvement in these areas. It also regularly and closely monitored these areas.

**VIII. Holiday Inn Franchisee Defendants and the Staff at the Holiday Inn Locations Named Herein Acted as Actual Agents of IHG Franchisor Defendants.**

57

183.    IHG Franchisor Defendants are vicariously liable for the acts, omissions, and knowledge of their Franchisee Defendants and staff at their subject Holiday Inn locations named herein, which are IHG's actual agents or subagents.

184.    The IHG Defendants subjected their Franchisee Defendants to detailed standards and requirements regarding the operation of the subject Holiday Inn locations named herein through their franchising agreements, through detailed written policies and manuals, and expectations imposed by the IHG Franchisor Defendants as they oversaw and supervised hotel operations.

185.    The IHG Franchisor Defendants obscure the full extent of control they exercise over their Franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Franchisor Defendants imposed on their Franchisees:

   a. Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendants used at the subject Holiday Inn locations;

   b. Covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, décor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions;

   c. Dictated the specific manner in which Franchisee Defendants and hotel staff must carry out most day-to-day functions at the subject Holiday Inn locations; and

   d. Significantly exceeded what was necessary for IHG to protect its registered trademarks.

186.    In addition to the ways described above, upon information and belief, IHG exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendants' day-to-day operation of their subject Holiday Inn locations named herein, including the following ways:

58

a.  The IHG Franchisor Defendants required their franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Franchisor Defendants to protect their registered trademarks;

b.  The IHG Franchisor Defendants maintained a team of regionally based trainers to provide training at branded hotels. IHG Franchisor Defendants provided training for hotel management and select hotel staff on-site and at locations selected by Franchisors;

c.  The IHG Franchisor Defendants provided their hotels staff with training and controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

d.  The IHG Franchisor Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e.  The IHG Franchisor Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f.  The IHG Franchisor Defendants maintained oversight in hiring, disciplining, and terminating hotel management and employees;

g.  The IHG Franchisor Defendants required their franchisees to participate in mandatory centralized services for day-to-day operation of the hotel;

h.  For certain products and services that franchisees were required to purchase to operate the property, IHG Franchisor Defendants designated approved vendors and prohibited their franchisees from purchasing goods and services from anyone other than an approved vendor;

i.  The IHG Franchisor Defendants required their franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at through the hotel through direct access to the system;

j.  The IHG Franchisor Defendants set required staffing levels for the subject properties;

k.  The IHG Franchisor Defendants established detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

59

l.  The IHG Franchisor Defendants set requirements for the hiring process used by their franchisees and oversaw employee discipline processes and termination decisions;

m.  The IHG Franchisor Defendants provided benefits for employees of franchised hotels;

n.  The IHG Franchisor Defendants controlled channels for guests to report complaints or provide feedback regarding their subject properties and directly participated in the response and/or supervised and the response to customer complaints or other feedback. IHG retained the right to provide refunds or other compensation to guests and to require Franchisee Defendants to pay associated costs;

o.  The IHG Franchisor Defendants generated reports and analysis of guest complaints and online reviews for their subject properties;

p.  The IHG Franchisor Defendants set detailed requirements for insurance that Franchisee Defendants must purchase;

q.  The IHG Franchisor Defendants exercised or retained control over their franchisees' day-to-day accounting and banking practices;

r.  The IHG Franchisor Defendants regularly audited the books and records of the Franchisee Defendants;

s.  The IHG Franchisor Defendants conducted frequent and unscheduled inspections of their subject properties;

t.  The IHG Franchisor Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if their franchisees violated any of IHG's detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of their subject properties;

u.  The IHG Franchisor Defendants controlled all marketing for their subject properties, directly provided marketing services, and prohibited Franchisee Defendants from maintaining any online presence unless specifically reviewed and approved by IHG Defendants;

v.  The IHG Franchisor Defendants exercised or retained control over all aspects of building and facility design;

w.  The IHG Franchisor Defendants imposed detailed recordkeeping and reporting requirements on their Franchisee Defendants regarding virtually all aspects of hotel operations. The Franchisor Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations;

60

x.  IHG Franchisor Defendants supervised and controlled day-to-day operations of their subject properties through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee Defendants to use;

y.  IHG Franchisor Defendants required their franchisees and hotel staff to implement a data system that gives Franchisors real-time information that it can monitor on a day-to-day basis; and

z.  IHG Franchisor Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

187.  Upon information and belief, IHG Franchisor Defendants had the right to and did enforce its control over theirFranchisee Defendants through various methods, including:

a.  The right to conduct detailed inspections of the subject properties;

b.  Monitoring or auditing the Franchisee Defendant for compliance with policies and expectations;

c.  Directing Franchisee Defendants to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d.  Mandating training and education for franchisees and/or hotel staff;

e.  Employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

f.  The right to impose fines or penalties;

g.  The right to impose additional conditions on franchisees or to restrict or limit its rights toprovide goods and services; and

h.  The right to terminate the franchise agreements for failure to comply with policies that govern the means and methods used for day-to-day operations.

188.  The IHG Franchisor Defendants are also vicariously liable for Holiday Inn Franchisees and the hotel staff because it retained and exercised control over the specific instrumentalities and aspects of operations that caused Jane Doe (C.A.A.)'s harm, including but not limited to reservations of rooms, hotel security, and detection of and response to suspected sex trafficking. IHG Franchisor Defendants had the right to exercise detailed, day-to-day control over and involvement in these areas. It also regularly and closely monitored these areas.

61

IX.    **The Hyatt Franchisor Defendants are jointly responsible for the trafficking of Jane Doe (C.A.A.).**

189.    The Hyatt Franchisor Defendant was a participant in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

190.    Upon information and belief, operation of the subject Hyatt location were part of a single unified operation by the Hyatt Franchisor Defendants. Upon information and belief, the Hyatt Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, the Hyatt Franchisor Defendant acted jointly to own, operate, control, manage, and supervise their subject Hyatt location. As an integrated enterprise and/or joint venture, the Hyatt Franchisor Defendant was separately and jointly responsible for compliance with all applicable laws.

X.    **The IHG Franchisor Defendants are jointly responsible for the trafficking of Jane Doe (C.A.A.).**

191.    All the IHG Franchisor Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

192.    Upon information and belief, operation of the subject Holiday Inn locations were part of a single unified operation by the IHG Franchisor Defendants. Upon information and belief, all IHG Defendants share a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, IHG Franchisor Defendants acted jointly to own, operate, control, manage, and supervise their subject Holiday Inn

locations. As an integrated enterprise and/or joint venture, the IHG Franchisor Defendants were separately and jointly responsible for compliance with all applicable laws.

## XI.     Each Defendants are Jointly and Severally Liable for Jane Doe (C.A.A.)'s Damages.

193.     The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (C.A.A.).

194.     Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (C.A.A.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking

## CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

195.     Jane Doe (C.A.A.)  incorporates all previous allegations.

## I.     Count 1: Beneficiary Liability under §1595 (a) of the TVPRA (Hyatt Franchisor Defendant and Hyatt Franchisee Defendant).

196.     Jane Doe (C.A.A.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

197.     All Hyatt Franchisor Defendants and Hyatt Franchisee Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as further described above, each Defendant knowingly benefitted, by receiving additional revenue and other benefits, from its participation in a venture these Defendants knew or should have known was engaged in a violation of the TVPRA.

198.    **Venture 1:** Through acts and omissions more fully described throughout this Complaint, each Hyatt Franchisor Defendant and Franchisee Defendant received a financial benefit from participating a venture with sex traffickers, including Jane Doe (C.A.A.)'s trafficker. Each Hyatt Franchisor Defendant and Franchisee Defendant violated the TVPRA through its participation, as a beneficiary, in Venture 1 as follows:

   a. Venture 1 resulted when Hyatt Franchisor Defendant and Hyatt Franchisee Defendant developed and maintained a continuous business relationship and implicit understanding with sex traffickers at the Subject Hyatt location by renting them hotel rooms and providing them related services despite the fact that each Hyatt Franchisor Defendant and Hyatt Franchisee Defendant knew or should have known these traffickers were using the Subject Hyatt location to engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2), including the trafficking of Jane Doe (C.A.A.).

   b. This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including Jane Doe (C.A.A.), in the rooms of the Subject Hyatt location.

   c. Each Hyatt Franchisor Defendant and Hyatt Franchisee Defendant knew or should have known Venture 1 engaged in violations of the TVPRA.

   d. Each member of Venture 1 pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including Jane Doe (C.A.A.)'s trafficker) rented rooms to earn profits by exploiting trafficking victims (including Jane Doe (C.A.A.)'s). Each member of Venture 1 received a financial benefit every time a trafficker rented a room.

   e. Each Hyatt Franchisor Defendant and Hyatt Franchisee Defendant participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including Jane Doe (C.A.A.')s trafficking).

199.    **Venture 2:** Through acts and omissions more fully described throughout this Amended Complaint, the Hyatt Franchisor Defendant received a financial benefit from participating in Venture 2 with Hyatt Franchisee Defendant operating their Subject Hyatt location. The Hyatt Franchisor Defendant violated the TVPRA through participation, as a beneficiary, in Venture 2 as follows:

64

a. Venture 2 is a commercial venture that resulted from the business relationship between the Hyatt Franchisor Defendant during its respective time as franchisor for their Subject Hyatt location and  their subject Franchisee to operate their Subject Hyatt location with a common objective of maximizing revenue at the hotels, including gross room revenue.

b. The venture violated the TVPRA through the widespread sex trafficking that occurred at the Subject Hyatt location, including the trafficking of Jane Doe (C.A.A.). This venture also violated the TVPRA through the conduct of the Hyatt Franchisee, who violated 18 U.S.C §1591(a) as a perpetrator.

c. The Hyatt Franchisor Defendant, at the relevant time, knew or should have known Venture 2 was engaged in violations of the TVPRA.

d. The Hyatt Franchisor Defendant knowingly benefited from this venture through the management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the Subject Hyatt location, which increased every time a room was rented including rooms rented to traffickers.

e. The Hyatt Franchisor Defendant, at the relevant time, participated in this venture by (1) continuing the ongoing business relationship with its respective Franchisee despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

200. The ventures in which the Hyatt Franchisor Defendant and Hyatt Franchisee Defendant participated were a direct, producing, and proximate cause of the injuries and damages to Jane Doe (C.A.A.).

II. **Count 2: Beneficiary Liability under §1595 (a) of the TVPRA (IHG Franchisor Defendants and Holiday Inn Franchisee Defendants).**

201. Jane Doe (C.A.A.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the

person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

202.   All IHG Franchisor Defendants and Holiday Inn Franchisee Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as further described above, each IHG Franchisor Defendant and Holiday Inn Franchisee Defendant knowingly benefitted, by receiving additional revenue and other benefits, from its participation in a venture the IHG Franchisor Defendants and Holiday Inn Franchisee Defendants knew or should have known was engaged in a violation of the TVPRA.

203.   **Venture 1:** Through acts and omissions more fully described throughout this Complaint, each IHG Franchisor Defendant and Holiday Inn Franchisee Defendant received a financial benefit from participating a venture with sex traffickers, including Jane Doe (C.A.A.)'s trafficker. Each IHG Franchisor Defendant and Holiday Inn Franchisee Defendants violated the TVPRA through its participation, as a beneficiary, in Venture 1 as follows:

 f.   Venture 1 resulted when IHG Franchisor Defendants and Holiday Inn Franchisee Defendants developed and maintained a continuous business relationship and implicit understanding with sex traffickers at the Subject Holiday Inn locations by renting them hotel rooms and providing them related services despite the fact that each IHG Franchisor Defendant and Holiday Inn Franchisee Defendants knew or should have known these traffickers were using the Subject Holiday Inn locations to engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2), including the trafficking of Jane Doe (C.A.A.).

 g.   This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including Jane Doe (C.A.A.), in the rooms of the Subject Holiday Inn locations.

 h.   Each IHG Franchisor Defendant and Holiday Inn Franchisee Defendants knew or should have known Venture 1 engaged in violations of the TVPRA.

 i.   Each member of Venture 1 pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including Jane Doe (C.A.A.)'s trafficker) rented rooms to earn profits by exploiting trafficking victims (including Jane Doe (C.A.A.)'s). Each IHG Franchisor Defendant and Holiday Inn Franchisee Defendants received a financial benefit every time a trafficker rented a room.

66

j.  Each IHG Franchisor Defendant and Holiday Inn Franchisee Defendants participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including Jane Doe (C.A.A.)'s trafficking).

204.    **Venture 2:** Through acts and omissions more fully described throughout this Amended Complaint, the IHG Franchisor Defendants received a financial benefit from participating in Venture 2 with Holiday Inn Franchisee Defendants operating the Subject Holiday Inn locations. Each of the IHG Franchisor Defendants violated the TVPRA through participation, as a beneficiary, in Venture 2 as follows:

a.  Venture 2 is a commercial venture that resulted from the business relationship between each IHG Franchisor Defendant during its respective time as franchisor for the Subject Holiday Inn locations and the subject Holiday Inn Franchisees to operate the Subject hotels with a common objective of maximizing revenue at the hotels, including gross room revenue.

b.  The venture violated the TVPRA through the widespread sex trafficking that occurred at the Subject Holiday Inn locations, including the trafficking of Jane Doe (C.A.A.). This venture also violated the TVPRA through the conduct of Holiday Inn Franchisees, who violated 18 U.S.C §1591(a) as a perpetrator.

c.  Each IHG Franchisor Defendant, at the relevant time, knew or should have known Venture 2 was engaged in violations of the TVPRA.

d.  Each IHG Franchisor Defendant knowingly benefited from this venture through the management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the Subject Holiday Inn locations, which increased every time a room was rented including rooms rented to traffickers.

e.  Each IHG Franchisor Defendant, at the relevant time, participated in this venture by (1) continuing the ongoing business relationship with Holiday Inn Franchisees despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

67

205.    The ventures in which each IHG Franchisor Defendant and Holiday Inn Franchisee Defendants participated were a direct, producing, and proximate cause of the injuries and damages to Jane Doe (C.A.A.).

### III.    Count 3: Vicarious Liability for TVPRA Violations (Hyatt Franchisor Defendant).

206.    Hyatt Franchisee Defendant acted as the actual agent of its respective Franchisor Defendant when operating its respective hotel property. The agency relationship between the Franchsiee and their Franchisor lasted for the period during which the Hyatt Franchisor Defendant was involved in operation of their Subject hotel through its role as franchisor.

207.    Through the acts and omissions described throughout this Amended Complaint, Hyatt Franchisor Defendant, at the relevant time, exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its Franchisee Defendant to operate the Subject Hyatt property, the specific aspects of operations that caused Jane Doe (C.A.A.)'s harm as described above.

208.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agents and its subagents.

209.    As a result of the relationship between Hyatt Franchisee and Hyatt Franchisor Defendant, Franchisor is vicariously liable for the acts of Franchisee, including at the Subject Hyatt location. Factors that support this allegation are that Hyatt Franchisor shared profits, standardized employee training, standardized and strict rules of operations, Hyatt Franchisor controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Finally, Hyatt Franchisor had the right to terminate any franchisee that failed to comply with the requirements promulgated by Hyatt Franchisor. Thus, Hyatt Franchisor Defendant, retained control, or the right to control, the mode and manner of work contracted for.

210.    As alleged above, The Hyatt Franchisor Defendant are directly liable to Jane Doe (C.A.A.) for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). Hyatt Franchisee Defendant is also directly liable to Jane Doe (C.A.A.) under § 2255. Hyatt Franchisor Defendants are vicariously liable to Jane Doe (C.A.A.) for those same violations.

211.    Each Hyatt Franchisor and Franchisee's failure to train and supervise their agents and employees, which was unreasonable in light of the known risk of sex trafficking at the Subject Hyatt location, enabled and contributed to the sex trafficking of Jane Doe (C.A.A.).

### IV.    Count 4: Vicarious Liability for TVPRA Violations (IHG Franchisor Defendants).

212.    Holiday Inn Franchisee Defendants acted as the actual agent of the IHG Franchisor Defendants when operating the subject Holiday Inn locations. The agency relationship between the Holiday Inn Franchsiees and the IHG Franchisor Defendants lasted for the period during which the IHG Franchisor Defendants were involved in operation of the Subject hotels through its role as franchisor.

213.    Through the acts and omissions described throughout this Amended Complaint, IHG Franchisor Defendants, at the relevant time, exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its Franchisee Defendants to operate the subject hotel properties, the specific aspects of operations that caused Jane Doe (C.A.A.)'s harm as described above.

214.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agents and its subagents.

215.    As a result of the relationship between Franchisee and Franchisors, IHG Franchisor Defendants are vicariously liable for the acts of the Holiday Inn Franchisee Defendants, including

69

at the Subject Holiday Inn locations. Factors that support this allegation are that IHG Franchisors shared profits, standardized employee training, standardized and strict rules of operations, IHG Franchisors controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Finally, IHG Franchisors had the right to terminate any franchisee that failed to comply with the requirements promulgated by IHG Franchisors. Thus, IHG Franchisors retained control, or the right to control, the mode and manner of work contracted for.

216.    As alleged above, IHG Franchisor Defendants are directly liable to Jane Doe (C.A.A.) for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). Holiday Inn Franchisee Defendants are also directly liable to Jane Doe (C.A.A.) under § 2255. IHG Franchisor Defendants are vicariously liable to Jane Doe (C.A.A.) for those same violations.

217.    Each IHG and Holiday Inn Defendants' failure to train and supervise their agents and employees, which was unreasonable in light of the known risk of sex trafficking at the Subject Holiday Inn locations, enabled and contributed to the sex trafficking of Jane Doe (C.A.A.).

## TOLLING OF LIMITATIONS

218.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (C.A.A.) invokes the discovery rule.  At the time of her trafficking, Jane Doe (C.A.A.) was under the physical control of her trafficker, who manipulated her through a combination of emotional abuse and physical violence. While she knew she was being posted online and forced to engage in sex acts for her trafficker's financial benefit, she did not know that she was the victim of human trafficking as that term is defined by law or that her injury arose from being trafficked at Defendants' hotels.  Like many survivors, Jane Doe (C.A.A.) internalized her exploitation and understood it through the lens of a dysfunctional relationship and personal failure—not as a victim

of force, fraud, or coercion. Even after escaping her trafficker's physical control and the psychological manipulation instilled by her trafficker continued to impair her ability to understand her victimization. Jane Doe (C.A.A.) did not recognize the legal nature of her injury or the role of those who enabled and profited from her exploitation until well after the trafficking ended.

219. To the extent Defendants assert an affirmative defense of limitations, Jane Doe (C.A.A.) invokes the doctrine of equitable tolling. As a result of being a victim of trafficking, Jane Doe (C.A.A.) faced extraordinary and ongoing circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit. These circumstances include years of sustained trauma and threats of abuse to herself and her family, introduced and maintained by her trafficker to ensure control. She continued to suffer the effects of psychological manipulation long after her trafficking ended. These impairments severely limited her ability to process what had happened to her, to recall key events and timelines, or to understand that she had legal rights and potential claims.

220. Throughout her trafficking, Jane Doe (C.A.A.) was beaten, sexually assaulted, and psychologically manipulated by her trafficker. The trauma she endured left her with lingering impairments, including memory lapses, confusion, and an inability to understand the nature of her experiences. These impairments did not immediately disappear upon the end of her trafficking. Instead, they continued to influence her beliefs, memories, and behavior for years, leaving her unable to recognize her experiences as sex trafficking.

221. While under the physical control of her trafficker, Jane Doe (C.A.A.) did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. After that physical control ended, she remained unable to conceptualize her experience as trafficking due to continued psychological trauma. At no point during or immediately after her exploitation did she believe she had been the victim of trafficking; she viewed her experience as the result of a toxic relationship and her own personal failings. It was only much later—after gaining distance from her trafficker's influence and beginning to process her trauma—that she came to understand what had occurred and to seek legal recourse.

71

222.     To the extent Defendants assert an affirmative defense of limitations, Jane Doe (C.A.A.) invokes the continuing tort doctrine.  This lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, at the Subject Hotels. The nature of this repeated conduct, and the ongoing harm it caused, supports application of the continuing tort doctrine to toll the limitations period.

223.     Jane Doe (C.A.A.) was trafficked at the Subject Hotels in May 2014.  Even after her trafficker's control ended, Jane Doe (C.A.A.) continued to suffer the lasting effects of his manipulation. These impairments—emotional instability, and a warped understanding of her own victimization—prevented her from recognizing the legal nature of her injuries or the role played by the entities that enabled or profited from her trafficking.

224.     In fact, Jane Doe (C.A.A.) was subject to continuous trafficking through at least October 2014, which is not more than 10 years before she filed this lawsuit.

225.     This continuous trafficking resulted from Defendants' ongoing facilitation of sex trafficking at the Subject Hotels and Defendants' continued ventures with one another and with criminal traffickers.  Defendants' conduct allowed the trafficking to continue over an extended period of time and contributed to the lasting harm Jane Doe (C.A.A.) suffered.  That harm did not end when she left the Subject Hotels or escaped her trafficker's physical control.

## DAMAGES

226.     Defendants' acts and omissions, individually and collectively, caused Jane Doe (C.A.A.) to sustain legal damages.

227.     Hyatt Franchisor and Hyatt Franchisee Defendant are joint and severally liable for all past and future damages sustained by Jane Doe (C.A.A.).

228.     IHG Franchisor and Holiday Inn Franchisee Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (C.A.A.).

229. Jane Doe (C.A.A.) is entitled to be compensated for personal injuries and economic damages, including:

    a. Actual damages (until trial and in the future);

    b. Incidental and consequential damages (until trial and in the future);

    c. Mental anguish and emotional distress damages (until trial and in the future);

    d. Lost earnings and lost earning capacity (until trial and in the future);

    e. Necessary medical expenses (until trial and in the future);

    f. Life care expenses (until trial and in the future);

    g. Physical pain and suffering (until trial and in the future);

    h. Physical impairment (until trial and in the future);

    i. Exemplary/Punitive damages;

    j. Attorneys' fees;

    k. Costs of this action; and

    l. Pre-judgment and all other interest recoverable.

## JURY TRIAL

230. Jane Doe (C.A.A.) demands a jury trial on all issues.

## RELIEF SOUGHT

231. WHEREFORE, Jane Doe (C.A.A.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (C.A.A.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (C.A.A.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

/s/ Annie McAdams
**ANNIE MCADAMS PC**
Annie McAdams | SBN 24051014
2900 North Loop West
Suite 1130
Houston Texas 77092
(713) 785-6262
(866) 713-6141 Facsimile
*annie@mcadamspc.com*

and

*/s/ David Harris*
**SICO HOELSCHER HARRIS, LLP**
David E. Harris | SBN 24049273
Meagan Hassan | SBN 24065385
819 N. Upper Broadway
Corpus Christi, Texas 78401
(361) 653-3300
(361) 653-3333 Facsimile
*dharris@shhlaw.com*
*mhassan@shhlaw.com*

**ATTORNEYS FOR PLAINTIFF**

74